# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-CT-00875-SCT

*RANDAL R. PALMER AND LYNN I. PALMER*
*INDIVIDUALLY AND ON BEHALF OF ANNE*
*PALMER, A MINOR*

*v.*

*VOLKSWAGEN OF AMERICA, INC., VAN-TROW*
*VOLKSWAGEN, INC., VOLKSWAGEN A.G. a/k/a*
*VOLKSWAGENWERK AKTIENGESELLSCHAFT*
*AND VOLKSWAGEN DE MEXICO, S. A. DE C. V.*
*a/k/a VOLKSWAGEN OF MEXICO*

## ON MOTIONS FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 03/28/2001 |
| TRIAL JUDGE: | HON. W. SWAN YERGER |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | MICHAEL J. MALOUF, JR. |
| | MICHAEL JAMES MALOUF |
| ATTORNEYS FOR APPELLEES: | J. COLLINS WOHNER, JR. |
| | ROBERT H. PEDERSEN |
| | DAVID L. AYERS |
| | JIMMY B. WILKINS |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED IN PART AND REVERSED IN PART AND THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART - 04/07/2005 |
| MOTIONS FOR REHEARING FILED: | 02/09/2005, 02/10/2005 |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.    The motions for rehearing are denied.  The original opinions are withdrawn,  and these opinions are substituted therefor.

¶2.    Sixteen-year-old Anne Palmer left school in Madison, driving a 1995 Volkswagen Jetta that her parents allowed her to use.  She picked up her ten-year-old sister, Jennifer, and went home.  There, she called her mother and secured permission to drive the Jetta to a nearby convenience store to buy a Coke.

¶3.    After leaving the store, Anne traveled along U.S. Highway 51 in heavy, "stop and go" rush hour traffic, behind an unmarked Ford Crown Victoria driven by Madison City Police Officer Thomas Mikula.  Jennifer was seated in the front passenger seat, and neither Anne nor Jennifer wore a seat belt.  A minivan in front of the Crown Victoria stopped suddenly, and the Crown Victoria braked to avoid hitting the minivan. Anne applied her brakes, but the Jetta struck the rear end of the Crown Victoria, which then hit the minivan. The Jetta's driver-side and passenger-side air bags deployed, causing only minor injuries to Anne, but inflicting severe injuries to Jennifer, eventually resulting in her death.

¶4.    Jennifer's family filed suit against Volkswagen of America, Van-Trow Volkswagen, Inc., Volkswagenwerk Aktiengesellschaft, and Volkswagen de Mexico, alleging claims for negligence, breach of express and implied warranties, and violation of the Mississippi Product Liability Act, Miss. Code Ann. § 11-1-63 (Rev. 2002).[1]

---

[1]This included a claim for defective design, defective manufacture and inadequate warning.

2

¶5.     During the course of the trial, the court made several evidentiary rulings, over plaintiffs' objection, which are at issue in this appeal:[2]

1.      The trial court erred in excluding a picture and caption from the owner's manual.

2.      The trial court erred in excluding the National Transportation Safety Board's safety recommendations of November 2, 1995.

3.      The trial court erred in allowing videos of litigation testing.

4.      The trial court erred in refusing to allow certain expert testimony from Dr. Michael Wogalter and Myra Kruckenburg.

5.      The trial court erred in refusing to exclude certain expert testimony from Greg Miller.

6.      The trial court erred in allowing evidence of seat belt use by Anne Palmer and the Palmer family.

7.      The trial court erred in excluding SCI reports and evidence of properly belted occupants injured by air bags.

¶6.     The trial court directed a verdict for defendants on the plaintiffs' claims of negligence, breach of warranty, and defective manufacture, and submitted the case to the jury on the issues of defective design and inadequate warnings. After deliberation, the jury returned a verdict for the defendants on both claims, with a unanimous defense verdict on defective design, and a vote of eleven to one, in favor of the defendants on the claim of inadequate warnings.

---

[2]We will not address the assignments of error rejected by the Court of Appeals, as none were the subject of a petition for writ of certiorari.

¶7. The Palmers' appeal was assigned to the Court of Appeals, which affirmed the directed verdicts[3] granted to the defendants, and affirmed some of the trial court's evidentiary rulings, but reversed others and remanded the case for a new trial. *Palmer v. Volkswagen of Am., Inc.,* 2003 WL 22006296 (Miss. Ct. App. 2003).

## ANALYSIS

¶8. The precise question before us is whether one or more of the trial court's evidentiary rulings raised by plaintiffs on appeal were erroneous, requiring reversal of the jury verdict for the defendants on one or both issues submitted to the jury. This requires that we now examine each of those evidentiary rulings under the appropriate standard of review.

*The picture and caption from the owner's manual.*

¶9. The trial court allowed the defendants to remove a picture found on one page of the Owner's Manual for the Jetta, which depicted a small child in a child seat, facing backward, in the front passenger seat, and a caption under the picture.

---

[3]The Court of Appeals affirmed both directed verdicts, neither of which are at issue before this Court.



Your child may travel on the front passenger's seat only if you have a child restraint system which is specifically designed and approved by the child restraint system manufacturer for use in the front together with the restraint system installed at that position.

¶10.    Plaintiffs claim the picture was probative and admissible with respect to the inadequate warnings claim submitted to the jury. We must address whether the picture was admissible and, if so, whether the jury verdict might have been different, had it been allowed into evidence. The Court of Appeals addressed the issue as follows:

> The picture depicted a small child in a rearward facing child seat on the front passenger seat. The caption stated, "Your child may travel on the front passenger's seat only if you have a child restraint system which is specifically designed and approved by the child restraint system manufacturer for use in the front together with the restraint system installed at that position." The picture and caption directly contradicted information located in the "Supplemental Air Bag System" section of the manual, that stated, "WARNING Never install rearward facing child seats or infant carriers on the front passenger seat," that doing so can cause serious injury to the child from the inflating air bag, and to always install rearward facing child seats in the rear seat.

> The trial court granted Volkswagen's motion in limine and excluded the picture and caption. The [trial] court held that the picture of a small child in a rear-facing child seat placed in the front passenger seat was not relevant. Alternatively, the [trial]court held that the picture's probative value was

5

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

*Palmer,* 2003 WL 22006296, at *2 (footnote omitted).

¶11. The Court of Appeals then analyzed the trial court's two bases (relevance and prejudice) for exclusion of the picture, recognizing the trial court's reasoning that "material depicting a small child in a rearward facing passenger [child's] seat was not similar enough to the instant case [involving a ten-year old child sitting forward on the Jetta's seat] to be relevant," but nevertheless finding these dissimilarities were "insufficient to erode the logical probative value of [the picture and caption]."

¶12. The Court of Appeals then provided a lengthy discussion of what might have happened, had the plaintiffs read the Owner's Manual. It then addressed its view of the importance (or lack thereof) of the fact that the plaintiffs never read the Owner's Manual. Specifically, the Court of Appeals stated:

> Further, the [trial] court could not exclude the material as irrelevant based upon the Palmers' admission that they did not rely upon any information in the owner's manual. *This is because reliance on the manufacturer's warning is not an element of an inadequate warnings case.* Miss. Code Ann. §11-1-63 (Rev. 2002). The Palmers introduced evidence that they would have noticed and heeded an alternative warning.

*Palmer,* 2003 WL 22006296, at *4 (footnote & citation omitted) (emphasis added).

¶13. Defendants take great issue with the Court of Appeals' statement, "reliance on the manufacturer's warning is not an element of an inadequate warnings case," characterizing it as dramatic error, a "non-sequitur declaration," and "an invitation for the pursuit of

6

hypothetical claims." This holding, defendants forcefully argue, effectively removes the "causal connection" requirement of Miss. Code Ann. § 11-1-63(c).[4]

¶14. It seems to us the Court of Appeals' statement, and the defendants' argument, are both partially correct, that is, reliance on the manufacturer's warning *may, or may not, be* an element of an inadequate warnings case.

¶15. Complaints of inadequate warnings may charge that certain warnings which were not given, should have been. In such cases, the Court of Appeals is certainly correct that "reliance on the manufacturer's warning is not an element of an inadequate warnings case." The absence or a warning is the gravamen of such claims, and a plaintiff can certainly not be expected to show reliance on a warning which was not given.

¶16. However, plaintiffs also may, for a variety of reasons,[5] complain that certain warnings which were given, were defective. In such cases, a plaintiffs must have read and relied upon the defective warnings to complain of them.

¶17. In the case before us, the defendants provided warnings regarding the air bags in two places: on the sun visors and in the Owners' Manual. The Court of Appeals found these warnings to be confusing, misleading and thus defective. The picture, according to the Court of Appeals, renders the Owner's Manual even more confusing, misleading and defective.

---

[4]Miss. Code Ann. § 11-1-63(a)(iii), provides that, in order to recover, the plaintiff must prove "[t]he defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought."

[5]Typical complaints are that the warnings were confusing, misleading, or difficult to follow.

¶18. Defendants, on the other hand, claim that the warnings in the Owner's Manual and on the sun visors were adequate and, even if they weren't, the plaintiffs -- by their own admission -- did not read or rely on them. This, according to defendants, amounts to an absence of the proximate cause required by Miss. Code Ann. § 11-1-63(a)(iii).

¶19. Plaintiffs respond by agreeing that they must prove proximate cause, but refer to the possibility pointed out by the Court of Appeals that "an inadequate warning may proximately cause an injury precisely because the plaintiff failed to notice it." Plaintiffs further point out that the Court of Appeals "acknowledged that if the manufacturer's warning is not visible, then such is further evidence that said warning is inadequate."

¶20. These arguments stray miles from the issue before the trial court when it refused to admit the picture. The Court of Appeals' statement that the Palmers "introduced evidence that they would have noticed and heeded an alternative warning" completely ignores the fact that the Palmers admitted that they didn't read the manual. Having not read the manual, the Palmers would not have "noticed and heeded an alternative warning," an adequate warning, the picture, or anything else in the manual.

¶21. The presence or absence of anything in an unread owner's manual simply cannot proximately cause a plaintiff's damages.[6] That is precisely the case here, with respect to the picture. Plaintiffs make the following statement regarding the picture:

---

[6]This, of course, does not eliminate the possibility that some other failing on the part of a defendant may prevent or discourage a consumer from accessing the owner's manual. In such cases, it is the "other failing," which would serve as the proximate cause. This is so, whether or not the content of the manual is defective. We discuss this possibility, as it might apply to this case, *infra*.

The exclusion of the pictorial and language was extremely prejudicial to Plaintiffs' warning case. The pictorial clearly shows that the air bag "warnings" were inconsistent and very misleading. Plaintiffs' expert, Dr. Wogalter, proffered that the pictorial suggested to Plaintiffs' [sic] and other consumers that "it's a-okay to put a rear-facing child seat here and no doubt an older child as well." A plain reading of the manual would lead any reasonable person to believe that if an infant is safe in the front seat, then certainly a ten (10) year old is safe in the front seat.

¶22. Plaintiffs, and Dr. Wogalter, may very well be correct. However, this case does not involve plaintiffs who were misled by the manual. The plaintiffs in this case did not read the manual at all. Thus, they hardly can claim to have been harmed or misled by it.

¶23. Although this Court has never addressed this precise issue, we are provided instruction from other jurisdictions, which have.

¶24. In *Graves v. Church & Dwight Co.*, 631 A.2d 1248, 1258 (N.J. Super. Ct. App. Div. 1993), the New Jersey court affirmed a judgment for the defendant manufacturer where, even though it provided an inadequate warning, there was inadequate evidence that warning had ever been read.

¶25. Similarly, in *General Motors Corp. v. Saenz ex rel. Saenz*, 873 S.W.2d 353, 361 (Tex. 1993), the Supreme Court of Texas reversed a jury verdict for the plaintiff, finding no evidence that the inadequacies in the manufacturer's warning caused the accident. The evidence indicated that the driver ignored the warning plate attached to the doorjamb and the warning contained in the owner's manual.

¶26. Also, in *Bushong v. Garman Co.*, 843 S.W.2d 807, 811 (Ark. 1992), the Arkansas Supreme Court affirmed summary judgment for the defendant manufacturer. The court found an absence of proximate cause based on the plaintiff's testimony that he had not read

9

a label on a cleaner in "over three years," and that any different or improved warning would have been "futile" and would not have prevented the injuries which the plaintiff sustained.

¶27. In *Gauthier v. McDonough Power Equip., Inc.*, 608 So. 2d 1086, 1088-89 (La. Ct. App. 1992), the court affirmed a verdict for the manufacturer defendant because the father of the 12-year-old injured child testified that he did not read the warnings contained in the owner's manual, and that he routinely failed to read warnings provided with products.

¶28. In *Bloxom v. Bloxom*, 512 So. 2d 839, 850-51 (La. 1987), the plaintiff had not read the warning provided in the automobile operator's manual before parking his car over combustible materials. The court held that even an improved warning or set of instructions would have been "futile" and would not have prevented the injury.

¶29. We do recognize that, in some inadequate warning cases, "the very nature of the alleged breach is such that it causes a potential plaintiff to fail to read the warning which causes his injury. . . . [In such a case], the warnings are potentially inadequate because they are presented in a manner that prevents a customer from reading them and being warned." *E.R. Squibb & Sons, Inc. v. Cox*, 477 So.2d 963, 970 (Ala. 1985).

¶30. In the case before us, however, plaintiffs do not argue that it was improper for defendants to place air bag warnings in the owner's manual. They do, however, assert that the warning on the sun visor was inadequate to direct the owner (and others) to the manual. The Court of Appeals stated:

> The Palmers contend that they did not notice the sun visor warnings because they were defective, but would have noticed adequate sun visor warnings. The sun visor warnings directed the reader to the owner's manual. Had the

10

> Palmers heeded the sun visor warnings, they would have read the manual and encountered the potentially misleading picture and caption.

*Palmer*, 2003 WL 22006296, at n.2.

¶31.    This is an argument best suited for the jury.  Had the jury in this case found the Jetta's warnings, including those on the sun visors, to be defective for failure to properly direct the plaintiffs to the owner's manual for air bag warnings, the plaintiffs' proximate cause requirement would have been met – not by anything in the manual which might constitute a defective warning – but by the failure to properly warn the Palmers that they should refer to the manual.

¶32.    The plaintiffs (and the Court of Appeals) overlook the critical reality that the inadequate warnings claim (including their claim that the sun visor warning was inadequate) was rejected by the jury.  Since the Palmers were unable to convince the jury that the sun visors' warnings were defective, they cannot now credibly argue that, "[had they] heeded the sun visor warnings, they would have read the manual and encountered the potentially misleading picture and caption."  The fact is, they did not heed the sun visors' admonition to refer to the owner's manual.

¶33.    Here, the issue of the picture does not involve the absence of warning, or an invisible warning,  or an unnoticeable warning.  Rather, the question is whether the picture was admissible and, if so, whether jury's verdict for the defendants on the issue of inadequate warnings might have been different, had the trial court admitted the picture.  Given that the jury rejected the plaintiffs claim that the sun visor warning was defective, and that the Palmers did not read the owner's manual, we conclude that the trial court's exclusion of a

11

picture and caption, located within the manual, was not an abuse of discretion. This picture (never seen by any of the plaintiffs) which was contained in an owner's manual (never read by any of the plaintiffs) could not have proximately contributed to Jennifer's death. Indeed, nothing in the manual can be said to have contributed to the accident or to damages in this case. Thus, the trial court's exclusion of the picture and caption was not error.

*National Transportation Safety Board's Safety Recommendations of November 2, 1995*

¶34.    On November 2, 1995, the National Transportation and Safety Board (NTSB) informed automobile manufacturers by letter of seven accidents in which small children were killed or seriously injured by air bags. The letter further stated that parents were not being adequately warned of the danger posed by air bags to children. The letter recommended that manufacturers provide a follow-up warning by mail.

¶35.    Plaintiffs claim that the trial court erred in preventing the Palmers from using this NTSB letter to cross-examine one of defendants' witnesses, Richard Bandstra, and one of defendants' experts, Alan Dorris.

¶36.    We have carefully reviewed the record and find no indication that plaintiffs attempted to use the letter to cross-examine Bandstra. Although plaintiffs' counsel does not direct us to it, the record does reflect that counsel made a proffer of the letter through his expert, Dr. Wogalter. He testified, however, that he had not reviewed the letter in connection with this case.

¶37.    With respect to Dorris, plaintiffs' counsel asked whether he was familiar with the letter. Counsel for defendants immediately objected, followed by an unrecorded bench

12

conference. Thereafter, the trial court sustained the relevance objection, and counsel for plaintiffs moved on to other questions. Counsel for plaintiffs did not suggest or proffer the purpose for which he wished to use the letter. Nor did counsel attempt to authenticate the letter, or proffer any proof that the letter was even received by defendants. Thus, the letter was properly excluded by the trial court.

¶38. Plaintiffs argue that the NTSB letter "detailed seven child fatalities that were substantially similar to the subject accident." Plaintiffs further claim that the letter states "that consumers and parents were unaware that a danger existed." We read the letter differently.

¶39. First, four of the seven cases addressed by the letter are totally inapposite to the case before us.[7] The letter also addresses a 5-year-old child whose injuries resulted both from the air bag and head contact with the roof of the vehicle. The only instances cited in the letter which are at all similar to the case before us include a 6-year-old child and a 7-year-old child.

¶40. Most of the letter addresses the dangers posed by using rear-facing child seats. Furthermore, and most importantly, the letter states that in both cases which are similar to this case, "[t]he safety board also believes that the non-use or improper use of the vehicle lap/shoulder belts . . . resulted in the child being positioned too close to the air bag compartment module on the dashboard, so that when the air bag deployed, the child's head and upper body were struck by the air bag at its peak deployment force." The letter

---

[7]These four cases involve a 3-month old child, a 20-day old child, a 5-month old child, and a 6-month old child, none of whom were sitting in the passenger seat unassisted.

discusses in detail the considerable efforts made by the NHTSA to inform the public as to the dangers posed by air bags to infants in rear-facing infant seats. The letter states that the seven accidents described in the letter, however, "raise some concerns about the effectiveness of the approach that NHTSA has taken."

¶41. With respect to the dangers posed to small children, the letter recognizes that the NHTSA has promoted air bags as supplemental restraint systems. However, the letter states that "the Board is concerned that air bags may kill or severely injure small children under certain circumstances..." The letter then states:

> Therefore, the Safety Board believes that an immediate, highly visible nationwide multi-media campaign should be conducted to advise current owners of vehicles with passenger-side air bags, current owners of rear-facing child safety seats, and the motoring public of the dangers of placing a rear-facing child safety seat or an *unrestrained or improperly restrained* small child in the front seat of an air bag-equipped vehicle.

(emphasis added).

¶42. Thus, the letter arguably had probative value as some evidence that the public needed to be warned that small children (such as Jennifer) should not ride in the front passenger seat without using the seat belt restraints. However, Jennifer's father freely admitted that the entire family, including Jennifer, knew they were supposed to use the seat belts. Specifically, he testified

Q. Let me ask you what the family's policy was about wearing seat belts.

A. We would always buckle up, and there were always – because that was just a policy that we had that we all buckled up, and we always buckled from my knowledge. They were always buckled, and the kids were very good about buckling up.

14

Q. Let me ask you this. When you were in the car with all four family members, you and Lynn and the two girls, what was your policy with regard to it and what did you observe?

A. We would always buckle up, and a lot of times when we would get in the car, my daughter Jenny would be the first one to say don't forget to buckle up.

¶43. This testimony by Jennifer's father leaves little doubt that the warning envisioned by the November 2 letter would serve only to admonish the Palmers to do that which they already knew to do. Thus, its probative value is not such that it could rise above harmless error. Additionally, while there certainly may be some value to evidence which shows lack of public awareness, the potential for prejudice is certainly evident, and was weighed by the trial judge who did not abuse his discretion.

*Videos recreating the accident*

¶44. The trial court allowed the defendants to show the jury three videos which depicted several sled tests with dummy occupants. The purpose of the tests, according to defendants, was to demonstrate "occupant kinematics," or the movement of persons inside a vehicle during a crash. Plaintiffs, on the other hand, argue that there are too many differences in the staged demonstration and the real accident, rendering the videos prejudicial and misleading. These matters are left to the sound discretion of the trial judge. We cannot say he abused that discretion in allowing the videos.

*Plaintiffs' experts (Dr. Wogalter).*

15

¶45. The trial court accepted (without objection) plaintiffs' expert, Dr. Michael S. Wogalter, as an expert in human factors and warnings.[8] Dr. Wogalter testified that he thought the warning labels in the Volkswagen were inadequate. Specifically, in response to questions asked by plaintiffs' counsel, he testified:

Q. I'll ask you if you have had an opportunity to review the warning labels that were in the 1995 Jetta that was the subject of this accident. Have you done so?

A. Yes, I have.

Q. I think they have been actually introduced. The actual sun visor is in evidence, and here is one that's marked as Exhibit 7, which is the actual sun visor, and ask if you can identify that or if you've seen that previously, not the exact label – I mean the label and not the exact visor in your hand.

A. Yes, I've seen this label.

Q. I'll ask if at my request if you had an opportunity to review that label and if you have an opinion as to whether or not it complies with the requirements and mandates of Federal Motor Safety Standard Act 208?

A. I have reviewed it, and I do have an opinion about it.

Q. And what is that opinion, Dr. Wogater?

A. That it does not comply.

Q. With 208?

A. Yes.

---

[8]Dr. Wogalter has a B.A. in psychology, an M.A. in experimental psychology and a Ph.D. in human factors psychology. He is an associate professor of psychology at North Caroline State University, and his area of expertise was warnings.

¶46. At that point, Dr. Wogater then proceeded to explain why, in his opinion, the sun visor warnings were defective. However, when plaintiffs' counsel announced that he was going to ask "questions with regard to the warnings about the dangers of passenger air bags to young children in the right front seat," counsel for defendants objected, pointing out that Dr. Wogater was not qualified to testify regarding the dangers presented by air bags to young children. This was followed by a proffer, out of the presence of the jury, which clearly demonstrated that Dr. Wogater had no expertise in the mechanics or dangers of air bags in general, or the Jetta's air bags, in specific. For instance, when asked whether the dangers presented to a child by an air bag depended on how fast it deploys, Dr. Wogater testified, "I would assume so, yes." Then, when asked how fast the Jetta's air bags deployed, he testified, "I don't know the miles per hour or the velocity." He further testified that he did not know the peak performance of the Jetta's air bags. The trial judge observed:

> He's read a few articles, but there's been no showing to the Court that he has factual information or such knowledge for him to give an opinion as to what specific types of warnings there need to be for this kind of air bag in this automobile.
>
> I mean I could come up with some warnings or anybody else could that we think may be appropriate warnings, but unless we have some knowledge about air bags and the dangers and have either done testing ourselves or have read extensively in the field where tests were conducted and has some definite knowledge as a recognized expert on this, then it's nothing more than a lay person would have.

¶47. Then, based upon Dr. Wogater's lack of knowledge or expertise in the dangers presented by air bags, the trial court held that he could not testify regarding such dangers.

¶48. We recognize that, in many cases, experts must stray slightly, and briefly, from their field of expertise to arrive at opinions and conclusions. However, the area found by the trial

17

court to be off limits involved an evaluation by Dr. Wogater of the extent of the danger posed by the Jetta's air bags, and then matching that danger with an appropriate warning. This clearly was outside his expertise, and such opinions and testimony was properly excluded. We do not find, however, that the trial court prevented Dr. Wogater from testifying whether, in his opinion, the warnings on the sun visor were effective, likely to be seen or likely to be heeded. He was allowed to testify that, in his opinion, the sun visor warnings did not comply with federal law, and he was allowed to explain why he held that opinion.

¶49. We cannot find that the trial court abused its discretion in refusing to allow Dr. Wogater to testify about the dangers presented by air bags to children.

*Plaintiffs' experts (Myrna Kruckenburg).*

¶50. During discovery, it appears[9] that one or more of the defendants filed interrogatories to the plaintiffs, seeking information concerning experts, as allowed by M.R.C.P. 26(b)(4). Plaintiffs' only response to this interrogatory stated, "Plaintiffs have not yet determined who they may call as an expert at the trial of this matter, but will timely supplement this response." The record does not reflect that this supplemental interrogatory response was ever filed.[10]

---

[9]The record before us does not include the interrogatories or other discovery. We do note, however, that certain discovery information is included as various exhibits to various motions. We have no way to know if the discovery and responses provided to us is complete.

[10]Unlike most other discovery documents, including responses to a scheduling order, answers to interrogatories must be sworn. M.R.C.P. 33(b)(1).

¶51.    We note that the trial court entered several scheduling orders which required the parties to "designate their trial expert witnesses."  We further note that, at some point, plaintiffs filed a document titled "Plaintiffs' Designation of Expert Witnesses," which purports to "comply" with "Rule 26."  However, outside the requirement that parties properly respond to interrogatories, we find no compliance requirement under Rule 26.  We find it more likely that the designation of experts filed by plaintiffs was in response to the scheduling order.

¶52.    In their designation of experts, plaintiffs named Myrna Kruckenburg as a fact and expert witness to testify to "[t]he extent and nature of injuries sustained by Plaintiffs, Randal Palmer, Lynn Palmer, and Ann Palmer, as well as the treatment rendered."  Plaintiffs further stated that they had "not yet received Mr. and Mrs. Kruckenburgs' [sic] curriculum vitae or estimated cost for deposition or trial testimony, but will supplement as soon as said documents are received."  Finally, plaintiffs stated whey were not in possession of any reports by Mr. and Mrs. Kruckenburg.  No other information was provided to defendants prior to trial.

¶53.    At trial, when plaintiffs attempted to call Kruckenburg, defendants objected, claiming plaintiffs had not provided sufficient expert information pursuant to the requirements of the Mississippi Rules of Civil Procedure.  Plaintiffs responded that they had contacted counsel for defendants prior to trial and offered to present Kruckenburg for deposition.  The trial court found the offer of a deposition to be inadequate and refused to allow any testimony from Ms. Kruckenburg.

¶54.    Only in cases of abuse of discretion will we reverse a trial court's ruling on discovery matters.  ***Harkins v. Paschall,*** 348 So. 2d 1019, 1022 (Miss. 1977).  The Court of Appeals found that the trial judge abused his discretion in refusing to allow Ms. Kruckenburg to testify, based upon inadequate discovery responses.  Specifically, the Court of Appeals stated:  "Volkswagen had the burden to request further discovery or file a motion to compel, but it failed to complain until the trial.  Because Volkswagen did not meet its burden, the trial court erred by excluding Kruckenburg's testimony on this ground."***Palmer,*** 2003 WL 22006296, at *16 (citation omitted).

¶55.    We cannot agree that parties who file appropriate interrogatories seeking expert information acquire the additional burden of filing a motion to compel, where they are provided an answer which promises supplementation.  The trial court was well within its discretion in disallowing the testimony of Ms. Kruckenburg, based upon the failure of plaintiffs to provide expert information in response to either the interrogatory filed by defendants and the trial court's scheduling order.

*Defendants' expert, Greg Miller.*

¶56.    Defendants filed their designation of expert witnesses on June 30, 2000, which was the deadline set by the trial court in its March 16, 2000, scheduling order.  Greg Miller was not included.   However, when defendants filed their supplemental responses to interrogatories on December 22, 2000, they stated:

> All defendants supplement their prior responses to state that they may call as a witness at trial Greg Miller, an engineer . . . .  Defendants expect Mr. Miller to testify, generally speaking, regarding the pertinent airbag technology utilized in the subject vehicle, and compare it to other vehicles of the same

20

generation. Mr. Miller is also expected to testify regarding his analysis of TRW's[11] validated data from the test lot that pertains to and includes the passenger airbag inflator for the subject vehicle, and how it compares to competitive vehicles, as well as how it compares to the tank test curve that is being relied upon by Mr. Rudnitsky for his opinions that the subject airbag was "aggressive." The test lot data rebuts Mr. Rutnitsky's opinions in this regard. Specifically, Mr. Miller has obtained the ballistic tank test lot data from TRW and scaled it for comparison to the inflator information in Appendix A. . . , being relied upon by Mr. Rudnitsky. Based on this comparison, the rise rate for the subject inflator is much closer to the average for the 1995 model year than the comparison conducted by Mr. Rudnitsky. By way of example, the rise rate, normalized for a 100 liter tank, is approximately 9.2 kpa/ms. Mr. Miller is also expected to testify in general rebuttal to the testimony of Mr. Rudnitsky regarding the so-called "dual stage" inflators that Mr. Rudnitsky claims to have been analyzed while at General Motors when he was developing the "F" car.

To the extent the above detailed information is considered to be expert testimony, defendants hereby supplement their expert designation to list Mr. Miller.

¶57. When plaintiffs objected to this expert designation, six months after the deadline, the trial court found that Miller would be precluded from testifying as an expert. However, defendants persuaded the trial court to allow "lay testimony" from Miller. The trial judge stated that "[Mr. Miller's going to] authenticate some engineering laboratory tests, or whatever, some engineering tests. He's going to testify as a fact witness." The trial court further stated that "the defendants are proceeding with only factual testimony from Mr. Miller, and he will not be able to give opinion testimony. . . . Mr. Miller . . . cannot get into opinion testimony, and specifically comparisons."

---

[11]TRW Vehicle Safety Systems, Inc., an independent company which manufactured the air bag used in the Palmers' Jetta.

¶58.   Counsel for plaintiffs then requested a continuing objection to Miller's entire testimony, claiming that it would be expert testimony disguised as lay testimony.  The trial court overruled the continuing objection, and defendants called Miller to the witness stand.

¶59.   During his testimony (which defendants characterize as simply factual),  Miller offered inter alia the following answers:

> Q.    What different temperatures to you utilize in conducting those tests?
>
> A.    Well, the procedure at the time was to conduct three ambient, which is room temperature, and one hot deployment, which is 185 degrees Fahrenheit.
>
> Q.    Why would you conduct a hot deployment?
>
> A.    In a worst case scenario if a car were to be sitting in Phoenix up in the instrument panel and it were to be heat soaked and you were to drive away and have a crash in a deployment, what happens with this particular type of inflation, and for that matter just about any type of inflation, is it becomes more energetic.  The output can rise based on the temperature, so one of the things that we want to check is to make sure that the warmer temperature that the tank curve is still within its corridor.  If it's too high, you can have trouble hanging on to the door or you can overexpand the module, that sort of thing.
>
> * * *
>
> Q.    Would you demonstrate that for us and give us the peak pressure and rise rate based on Exhibit 46B.[12]
>
> Q.    All I want is your calculation based on your experience at TRW, the calculation of the peak pressure and the rise rate on this particular one.
>
> A.    If I use this as a straight edge and line it up with the marks here, looking for the approximate peak, I'm drawing a line here and saying the maximum slope occurred someplace in this 10 millisecond window

---

[12]At this point, counsel for plaintiffs lodged another objection to the expert testimony. The trial judge overruled the objections, stating, "he hasn't given any opinions yet."

here. Now, what I would do is simply pick up where this point crosses and find out where this crosses, come down here, and then you can look at what the peak pressure is based on this chart, and if you do the calculations, this is 300 kpa minus zero, and then this would be 54 milliseconds minus the 8 milliseconds here to find out what this distance is, and if you plug that in your calculator – I happen to know what the answer is – it is 6.5, and the units on that are kpa per millisecond. The peak slope over here is between these two marks which would be about 212.

¶60. Throughout his testimony, Miller was asked to make and explain highly technical calculations, and then apply his results to industry standards and to explain why the testing and calculations he approved were necessary.

¶61. The problem appears to be a misunderstanding of expert testimony. M.R.E. 702 does not limit expert testimony to that which is expressed in the form of opinion. The rule states:

> If scientific, technical, or other specialized ***knowledge*** will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience training or education, may testify thereto in the form of an opinion ***or otherwise***.

Miss. R. Evid. 702 (emphasis added).

¶62. The testimony provided by Miller, a highly-skilled, specially educated engineer, very definitely required scientific, technical knowledge beyond that of the randomly selected adult. Such testimony therefore constituted expert testimony. ***Cotton v. State***, 675 So. 2d 308, 311 (Miss. 1996), citing ***Sample v. State***, 643 So. 2d 524, 530 (Miss. 1994); ***Miss. State Hwy. Comm'n v. Gilich***, 609 So. 2d 367, 377 (Miss. 1992) (lay opinions require no specialized knowledge); ***Wells v. State***, 604 So. 2d 271, 279 (Miss. 1992) (testimony requiring particular knowledge to assist trier of fact is expert testimony).

23

¶63. In *Cotton*, the controversy involved a witness who explained to the jury the mechanical features of a particular brand of gun. The witness stated that the gun would not fire unless a specific sequence of events was followed. We found that, "[i]n order to assist the jury, he was indeed required to reveal particular knowledge about the Llama .45 caliber semi-automatic pistol. We find that the testimony . . . constituted expert opinion." *Id*. at 311.

¶64. To be clear, the test for expert testimony is not whether it is fact or opinion. The test is whether it requires "scientific, technical, or other specialized knowledge" beyond that of the randomly selected adult." If so, the testimony is expert in nature, and must be treated in discovery, and at trial, as such.

¶65. This Court has held that it "will not reverse the admission or exclusion of evidence unless the error adversely affects a substantial right of a party." *Crane Co. v. Kitzinger*, 860 So. 2d 1196, 1199 (Miss. 2003) (citing *Floyd v. City of Crystal Springs*, 749 So. 2d 110,113 (Miss. 1999)). "[F]or a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Id.* (citing *Terrain Enter., Inc. v. Mockbee*, 654 So. 2d 1122, 1131 (Miss. 1995)).

¶66. On this issue, we find the conclusion reached by the Court of Appeals was exactly correct:

> The trial court abused it discretion by allowing Miller's testimony to stray into the realm of scientific, technical and specialized knowledge that only could be admitted as expert testimony after assessment pursuant to Rule 702.
>
> Further, the Palmers were prejudiced by Miller's impermissible expert testimony because Miller's testimony rebutted that of the Palmer's expert,

24

Rudnitsky. Rudnitsky opined that the average air bag inflation rise rate was 6 kilopascals per millisecond, and that the Jetta inflator's rise rate was 10.5 kilopascals per millisecond. He stated that this was 84% higher than the average for 1995 cars. He also stated that the Jetta's peak pressure was 26% higher than average for 1995 cars. He concluded that the Jetta's air bag was overly aggressive. Miller calculated and charted the 1995 Jetta inflator's peak pressure and rise rate at three different temperatures. He averaged the three peak pressures and arrived at an average rise rate of 6.7 kilopascals per millisecond. He averaged the three rise rates and arrived at an average rise rate of 211 kilopascals. Rudnitsky's higher calculations were offered to show that the Jetta's air bag was aggressive, and Miller's lower calculations of the Jetta's peak pressure and rise rate were offered to rebut Rudnitsky's conclusions. The trial court had already held that the Palmers were unprepared for expert testimony by Miller.

*Palmer,* 2003 WL 22006296, at \*19.

*Seat belt use by Anne Palmer and the Palmer family.*

¶67. Defendants introduced evidence tending to show that the Palmer family did not regularly use their seat belts. The purpose of this evidence, according to defendants, was the inference that, given all the warnings and admonitions concerning seat belt use, persons who ignored such warnings would probably not heed air bag warnings. The Court of Appeals found that Jennifer's seat belt use was admissible,[13] but the rest of the family's was not. The reason stated by the Court of Appeals for finding seat belt use by Anne Palmer and the Palmer family inadmissible, was that such evidence could have been interpreted as negligence, violating Miss. Code Ann. § 63-2-3, which provides:

> This chapter shall not be construed to create a duty, standard of care, right or liability between the operator and passenger of any passenger motor vehicle which is not recognized under the laws of the State of Mississippi as such

---

[13]The Court of Appeals held that, "if the jury accepted the argument that the air bag was a supplemental restraint, it went to the crux of whether Jennifer used the air bag as it was designed." *Palmer*, 2003 WL 22006296, at \*24.

laws exist on the date of passage of this chapter or as such laws may at any time thereafter be constituted by statute or court decision. Failure to provide and use a seat belt restraint device or system shall not be considered contributory or comparative negligence, nor shall the violation be entered on the driving record of any individual.

¶68. In *Estate of Hunter v. General Motors Corp.*, 729 So.2d 1264 (Miss. 1999), General Motors persuaded the trial court to admit evidence of seat belt non-use. On appeal, we held:

> This Court concludes that evidence of seat belt non-usage *may* constitute relevant evidence in *some* (but by no means all or even most) cases, so long as (1) the evidence has some probative value other than as evidence of negligence; (2) this probative value is not substantially outweighed by its prejudicial effect (See Miss. R. Evid. 403) and is not barred by some other rule of evidence and (3) appropriate limiting instructions are given to the jury, barring the consideration of seat belt non-usage as evidence of negligence.

*Estate of Hunter*, 729 So.2d at 1268. Since no limiting instruction was given in *Hunter*, this Court found reversible error. *See also* *Herring v. Poirrier*, 797 So.2d 797 (Miss. 2000) (use of seat belts admissible on the issue of injuries and their severity). *See also* *Golonka v. General Motors Corp.*, 65 P.3d 956 (Ariz. Ct. App. 2003); *Graves v. Church & Dwight Co.*, 631 A.2d 1248 (N.J. Super. Ct. App. Div. 1993) (plaintiff's smoking notwithstanding cigarette warning labels was relevant evidence as to whether he would have followed adequate warning on baking soda) (plaintiff's propensity for following other warnings in her truck's owner's manual could cause jury to infer that she would have heeded better warning about shifting defect);

¶69. Inadequate warnings cannot serve as the proximate cause of injuries where adequate warnings would have resulted in the same injuries. Where a plaintiff claims inadequate warnings, the defendant must be allowed to introduce evidence which would tend to

persuade a jury that, even if the warnings had been adequate, the plaintiff would not have heeded them. Where, as here, evidence of non-use of seat belts is offered for that purpose, and provided it passes all other tests of admissibility, it may be admitted. The trial court should caution the jury and instruct it on the limited use of the evidence.

¶70. In this case, the trial court was correct to admit the evidence, but should have given a cautionary instruction. On remand, however, the adequacy of warnings will not be an issue, and the evidence of seat belt use by the Palmer family (other than Jennifer) will not be relevant.

**CONCLUSION**

¶71. For these reasons, we affirm in part and reverse in part the judgments of the Court of Appeals and the Circuit Court of the First Judicial District of Hinds County, and we remand this case to the circuit court for a new trial consistent with this opinion limited to the plaintiffs' claim of defective design.

¶72. **THE JUDGMENT OF THE COURT OF APPEALS IS AFFIRMED IN PART AND REVERSED IN PART, AND THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

**SMITH, C.J., WALLER AND COBB, P.JJ., CARLSON AND RANDOLPH JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. DIAZ, J., NOT PARTICIPATING.**

**EASLEY, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶73. I concur with the majority's decision to affirm the jury verdict in favor of Volkswagen on the issue of inadequate warnings. The Palmers admitted that they never read the Volkswagen owner's manual. Therefore, the argument that the picture and caption

contained in the owner's manual was confusing, misleading and defective is not relevant or applicable to the issue of inadequate warning. I support the trial court's decision to exclude the picture and caption as irrelevant, based on the admission that the Palmers did not rely on or read the owner's manual.

¶74. However, I must respectfully dissent from the majority's decision to reverse the verdict in favor of Volkswagen and remand for retrial based on the testimony of Volkswagen's witness, Greg Miller. According to the record, Miller was not properly designated as an expert to the Plaintiffs by Volkswagen. The trial court allowed Miller to testify as a fact witness providing only factual testimony. Miller was not allowed to provide opinion testimony. The majority finds Miller's testimony constituted expert testimony pursuant to M.R.E. 702. In my opinion, the trial court properly limited Miller's testimony to prevent him from rendering an expert opinion. I disagree that Miller's testimony, limited to that of a factual witness, constituted expert testimony.

¶75. Therefore, I must respectfully concur in part and dissent in part, as I would affirm the trial court's decision in favor of Volkswagen in toto.