BARNES, J.,
for the Court:
¶ 1. Lecia Spriggs and Kurt Bueehler were married in 1989, while they were both medical residents at the Mayo Clinic in Minnesota. A few months after they were married, Kurt attended a rehabilitation program for drug and alcohol dependency and was treated for depression. The couple had two children born of the marriage: Connor, born on June 7, 1992, and Killian, born on May 26, 1994. Shortly after Killian’s birth, the couple moved to Mississippi. Lecia joined Surgical Anesthesia Group, where she was employed as an anesthesiologist. Kurt began working as a psychiatrist at the Mississippi Neu-ropsychiatric Clinic. Kurt still works at the clinic and is a partner in the practice. Kurt also speaks nationally for various pharmaceutical companies.
¶ 2. In 1998, Kurt started drinking again, and the couple sought counseling from Dr. Mary Brown. In 2002, it was determined that Lecia suffered from lumbar spondylosis, and she resigned from her practice as an anesthesiologist due to her back issues. In January 2003, Lecia began collecting disability payments, totaling $8,222 a month, through four insurance policies underwritten by Northwestern Mutual Life Insurance (Northwestern). Under the terms of her policies, Lecia may collect full disability benefits if she is unable to perform the principal duties of her occupation, anesthesiology, until age sixty-five. After she reaches sixty-five years of age, Lecia must be determined to be “totally disabled” to continue to receive benefits.
¶ 3. In 2009, it was revealed that Kurt had committed adultery during the marriage, and the couple again sought counseling from Dr. Brown. However, on August 12, 2010, Lecia and Kurt filed a joint complaint for divorce, citing irreconcilable differences. In January 2011, when Kurt suspended all financial support to Lecia, Lecia filed an amended complaint for divorce on fault grounds of uncondoned adultery and habitual cruel and inhuman treatment. She also sought custody of the couple’s minor children and temporary relief in the form of alimony and child sup *520 port. Kurt responded, admitting that Le-cia was “entitled to divorce on the ground of adultery,” but denying any habitual cruel and inhuman treatment. A temporary order was entered on June 27, 2011, awarding joint legal custody of the minor children to Kurt and Lecia, but sole physical custody of the children to Lecia. Kurt was also ordered to provide temporary support for the children, including insurance and medical expenses, transportation expenses, educational expenses, and child support of $1,000 per month to Lecia and each child. Lecia was not awarded temporary alimony, although Kurt was ordered to reimburse Lecia for household expenses (including homeowner’s dues, yard-maintenance expenses, and insurance premiums).
¶ 4. Soon thereafter, Lecia filed a motion to amend her complaint, requesting that she be allowed to withdraw her petition for divorce and, instead, be awarded separate maintenance. Kurt filed a counterclaim for divorce on the following grounds of fault: willful, continued and obstinate desertion for one year; habitual and excessive drug use; and habitual cruel and inhuman treatment; or, in the alternative, irreconcilable differences. The chancery court denied Lecia’s motion to amend her complaint on September 30, 2011.
¶ 5. A hearing was held October 17-19, 2011, during which the parties stipulated to divorce on the ground of uncondoned adultery by Kurt. The chancellor entered a final opinion on February 8, 2012, equitably dividing the marital assets using the factors set forth in Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994). Lecia was awarded both the marital residence and the couple’s vacation townhome in Key West, Florida, which was valued at $590,000. Lecia was ordered to sell the marital home, however, once Killian graduated from high school. Lecia received marital assets of approximately $1.2 million; the chancellor did not award any alimony. Kurt was ordered to continue to provide child support as set forth in the temporary order, with the chancellor specifically noting that the child-support payments of $1,000 per month to Lecia and the children were to terminate upon the children’s emancipation.
¶ 6. Lecia filed a motion to clarify and to amend the judgment on February 22, 2012, citing several issues.[1] Pertinent to this appeal was Lecia’s request to clarify Kurt’s obligation to pay the children’s educational expenses, and her assertions that the denial of alimony and the chancellor’s exclusion of Dr. Brown’s records constituted an abuse of discretion. In its order addressing Lecia’s motion, the chancery court determined that, absent an express agreement between the parties, it had “no authority to require Kurt to provide college support [for the children] beyond emancipation.” The order also denied Le-cia’s claims regarding alimony and Dr. Brown’s records.
¶ 7. Lecia now appeals the chancery court’s judgment, and finding no error, we affirm.
DISCUSSION
I. Whether the chancery court abused its discretion by denying excluding Dr. Brown’s records.
¶8. Throughout their marriage, Lecia and Kurt intermittently sought marital counseling. Lecia sought to introduce notes and records from the couple’s therapist, Dr. Brown, at trial. Kurt’s counsel objected since the records had not been *521 produced in accordance with the June 8, 2011 scheduling order, which stated that the parties were required “to serve documents which they have agreed or been ordered to produce, and also all written discovery responses (including amended and supplemental discovery responses) no later than Friday, August 5, 2011.” The order further required the designation of expert witnesses by August 26, 2011. However, since Dr. Brown’s records were not provided to Kurt until October 2011, the chancery court sustained Kurt’s objection to the admission of the records. Le-cia claims that the chancellor abused her discretion in excluding this evidence.
We will only reverse a trial court’s ruling on discovery matters if it constitutes an abuse of discretion. Palmer v. Volkswagen of Am., Inc., 904 So.2d 1077, 1090 (¶ 54) (Miss.2005). In Palmer, the Mississippi Supreme Court concluded that the trial court’s exclusion of testimony was not an abuse of discretion “based upon the failure of plaintiffs to provide expert infor-inforin response to either the interroga-interrogafiled by [the] defendants [or] the trial court’s scheduling order.” Id. at (¶ 55). In Bowie v. Montfort Jones Memorial Hospital, 861 So.2d 1037,1042 (¶ 14) (Miss. 2003), the supreme court held:
[T]rial judges are afforded considerable discretion in managing the pre-trial discovery process in their courts, including the entry of scheduling orders setting out various deadlines to assure orderly pre-trial preparation resulting in timely disposition of the cases. Our trial judges also have a right to expect compliance with their orders, and when parties and/or attorneys fail to adhere to the provisions of these orders, they should be prepared to do so at their own peril.
¶ 10. While Lecia’s counsel argued that Dr. Brown had been designated as an expert witness in accordance with the deadline in the scheduling order, she admitted that Dr. Brown would not be testifying; rather, Lecia would be relying on the records/documents. Those records were not produced until approximately two weeks prior to the hearing and well after the deadline set forth in the scheduling order. Therefore, we find no abuse of discretion in the chancery court’s decision to exclude the evidence of Dr. Brown’s records due to Lecia’s failure to abide by the discovery guidelines in the scheduling order.
IL Whether the chancery court erred in denying Lecia permanent alimony.
[3] 11. Lecia contends that the chancery court erred in not awarding her permanent alimony. Instead, the chancel-chancelawarded Lecia a greater portion (51.4%) of the marital estate in order “to eliminate a need for permanent, rehabilita-rehabilitaor lump sum alimony.” The total assets awarded to Lecia were valued at approximately $1.2 million. Among those assets were the couple’s marital home and their vacation home in Key West, which was valued at $590,000.
[4] 12. A chancery court “enjoys wide discretion in fashioning the financial aspects of the dissolution of a marriage” and will only be reversed on appeal if it abused that discretion. Avery v. Avery, 864 So.2d 1054, 1056 (¶9) (Miss.Ct.App. 2004). Using the factors set forth in Arm-Armv. Armstrong, 618 So.2d 1278 (Miss. 1993), the chancellor determined that ali-aliwas not warranted in this case.

1. The income and expenses of the parties

¶ 13. Lecia receives $8,222 per month in disability payments (approximately $98,000 annually). This amount is not sub *522 ject to cost-of-living increases. Lecia takes issue with the chancellor’s finding that she had no intention of supplementing her disability income; she contends that there was no evidence that she was able to supplement her disability income. Regardless, there is no dispute that Lecia should continue to receive $8,222 a month under her disability policies, unless she is later deemed able to work. Under the terms of her disability policies, Lecia also has the ability to supplement her disability income until age sixty-five, as long as she does not work as an anesthesiologist.
¶ 14. Since Lecia was ordered to sell the marital home after Killian graduates, the chancellor observed that Lecia’s proposed monthly expenses, which were listed at $11,189, should soon decrease, as she will be relieved of her, mortgage debt. On appeal, Lecia claims that the chancery court “required Lecia to move her residence to the Key West property to reduce her monthly expenses[.].” However, we find the court issued no such requirement in its order. The chancellor, in her analysis of the Ferguson factors, merely noted that Lecia “indicated ... her intention” to move to the couple’s Key West home, which would free her from any mortgage expenses, since the townhome was not encumbered by a mortgage. We do not find an abuse of discretion in the chancellor’s findings. At trial, Lecia testified that she wanted to stay at the marital home only until Killian went to college, although Le-cia also said she did not “have any intention of moving anytime really soon.” The townhome was currently rented, and Lecia stated that she does not “really have any reason to get in a hurry to get down there.” Further, Lecia acknowledges that the plan was for her to sell the marital home, relieving herself of its monthly mortgage payment of $1,125, along with the incidental expenses such as insurance and maintenance. Additionally, although not discussed by the chancellor, we note that Lecia has the ability to sell the Key West home and use the proceeds as she sees fit.
¶ 15. Kurt’s net monthly income was approximately $20,000. His monthly expenses were listed at $10,285, but he testified that his expenses are actually less than that amount. However, the chancellor anticipated that the monthly expenses would increase when Killian attends college. In fact, it was noted that Kurt was currently paying approximately $6,000 a month for the children’s educational expenses.

2. The health and earning capacity of the parties

¶ 16. Lecia has been diagnosed with lumbar spondylosis, and she is collecting disability payments. The chancellor noted that if Lecia were later found not to be disabled, she had the education and training to earn an income greater than her disability income. The terms of her disability policy also allow her to work in another field or capacity until age sixty-five, although Lecia claims that her required pain medication makes it unlikely she could obtain malpractice insurance. She stated that she takes 100 milligrams of Oxycontin daily, as well as Adderall and Prozac. Lecia also notes that she has been out of the medical field for nine years, although she admitted at trial that she was still a licensed physician.
¶ 17. Kurt is still gainfully employed and in good health, although his speaking engagements and income appear to be declining.

3. The needs of each party

¶ 18. As noted, Lecia requires prescription medication for her back problems/pain management.

*523
k. Obligations and assets of each party

¶ 19. Lecia was awarded a greater portion of the marital estate; she was awarded all of the couple’s real property, including the Key West townhome, which is free of indebtedness. The chancellor determined that Lecia’s financial obligations should lessen once she sells the marital domicile, and she is to receive-one-half of the proceeds from the sale of the home. Lecia was also awarded one-half of Kurt’s interest in his clinic, which was paid to her in a lump-sum amount of $40,156. She was awarded the Toyota Highlander, and was responsible for its monthly note of $1,097.
¶ 20. Kurt is responsible for the minor children’s “educational and support obligations.” The court noted that these ongoing expenses related to the children’s education were “extensive.”

5. Length of marriage

¶ 21. The couple were married in 1989; they separated in 2009.

6. Presence or absence of minor children in the home

¶ 22. At the time of the trial, the oldest child, Connor, was nineteen years old and attended Yale University; Killian was a high-school senior at St. Andrews Episcopal School. The chancellor noted that Kil-lian would likely attend college and not reside at home.[2]

7. The age of the parties

¶ 23. Lecia was forty-nine years old; Kurt was forty-eight years old.

8. Standard of living of both parties, both during the marriage and at the time of the support determination

¶ 24. Both parties enjoyed a very comfortable style of living while married, and the chancellor acknowledged that Kurt’s income provided Lecia with “the flexibility to work around their children’s schedules.” The couple employed a weekly maid service, and both children attended private school. The family traveled often, and the couple owned a vacation property in Key West. They had approximately $120,000 of equity in the marital home. Since the couple separated, Kurt had been living in an apartment, while Lecia remained in the marital home with the children.

9. Tax consequences

¶ 25. Lecia’s disability payments are not taxable income. Any award of alimony would be subject to tax.

10. Fault or misconduct

¶ 26. Although Lecia continues to allege that Kurt was emotionally abusive, the parties stipulated that Kurt’s uncondoned adultery was the basis for the divorce.

11. Wasteful dissipation of assets by either party

¶ 27. The chancellor did not find Kurt’s investments and trading activities to be wasteful. However, she did conclude that Kurt’s expenditure of $5,000 on his girlfriend was “wasteful in nature.”
¶ 28. After its thorough consideration of the Armstrong factors, the chancery court determined that there was no need for alimony. “[W]hether to award alimony and the amount of the award are matters left to the chancery court’s discretion.” Mauldin v. Mauldin, 107 So.3d 176, 180 (¶ 21) (Miss.Ct.App.2013) (citing Vaughn v. Vaughn, 798 So.2d 431, 436 (¶ 20) (Miss.2001)). “The chancellor should consider the lifestyle to which the *524 wife has become accustomed, the value of her assets and income, and the husband’s ability to pay.” Gambrell v. Gambrell, 650 So.2d 517, 524 (Miss.1995) (citing Brennan v. Brennan, 638 So.2d 1320, 1324 (Miss.1994)).
■ ¶ 29. In Pecanty v. Pecanty, 97 So.3d 1263, 1266-67 (¶22) (Miss.Ct.App.2012), this Court held:
If the divided assets, when considered with each party’s non-marital assets, will adequately provide for both parties, no more need be done. A wife is generally entitled to periodic alimony when her income is inadequate to allow her to maintain her standard of living and when her husband is able to pay.
(Internal citations and quotations omitted). In Pecanty, this Court upheld the chancellor’s decision to award rehabilitative alimony since, “[w]ithout alimony, [the wife would have] suffered] a disparity in income and a decline in her standard of living following the equitable division of marital assets.” Id.
¶ 30. Kurt cites Byrd v. Byrd, 100 So.3d 443 (Miss.2012), to support the chancellor’s decision that the equitable division of marital assets was sufficient to provide for Lecia and that no alimony was warranted. In Byrd, the wife was given almost $1 million in assets; she was a nurse and had an earning potential of almost $100,000 annually. Id. at 451 (¶ 26). Therefore, the supreme court could not say that the chancery court erred in finding the wife’s needs were sufficiently met by the equitable division of assets.
¶ 31. Similarly, in the present case, Le-cia received $1.2 million in marital assets. Even assuming that she is unable to supplement her disability income by working in another capacity, her disability income is over $98,000 annually (non-taxable). This is not a situation where the denial of alimony renders Lecia destitute. While Kurt was indeed the “breadwinner” in the household during the last few years of the marriage, Lecia is not financially dependent upon him for her personal expenses.
¶ 32. Unless a chancellor’s decision regarding whether to award alimony is “against the overwhelming weight of the evidence or manifestly in error,” we will not reverse the decision on appeal. Cosentino v. Cosentino, 986 So.2d 1065, 1067 (¶ 6) (Miss.Ct.App.2008). “In the case of a claimed inadequacy or outright denial of alimony, we will interfere only where the decision is seen as so oppressive, unjust or grossly inadequate as to evidence an abuse of discretion.” Houston v. Houston, 121 So.3d 283, 287 (IF 12) (Miss.Ct.App.2013) (quoting Rogillio v. Rogillio, 101 So.3d 150, 153 (¶ 11) (Miss.2012)). In the present case, the chancellor acknowledged that Lecia was accustomed to a “comfortable” lifestyle. Furthermore, she noted Kurt certainly had ability to pay alimony, although his salary was decreasing slightly, and he was responsible for the “extensive” educational expenses of two children, who both attended private universities.
¶ 33. However, Lecia also receives an annual (non-taxable) income of approximately $98,000, and she was awarded over $1 million in marital assets. Upon review, we find no manifest error in the chancery court’s decision not to award Lecia permanent alimony.
III. Whether the chancellor erred by not reserving jurisdiction over the matter.
¶ 34. Alternatively, Lecia argues that if alimony is not considered to be appropriate, the chancellor should have retained jurisdiction to award alimony in the future. At the hearing on the motion to clarify or amend the court’s order, counsel for Lecia requested that the chancery court, “at a minimum!,] ... award a nomi *525 nal sum of alimony to [Lecia] or preserve the option of a later award of alimony.”
¶ 35. Regarding Lecia’s contention that a nominal amount of alimony should have been awarded to retain jurisdiction, this Court has recently denounced this type of award in a recent opinion. In Jones v. Jones, 2011-CA-01440-COA, — So.3d —, —, 2013 WL 1800051, at *8 (¶36) (Miss.Ct.App. Apr. 30, 2013), we reversed a chancery court’s award of nominal alimony ($10 per month), stating:
By referring to the award as “nominal” alimony, it does not appear that the chancellor was trying to address an actual deficit in the property award. Rather, he admits he was simply leaving the door open in case future events prove [the wife] has a need and [the husband] has an ability to pay. Such a contingency plan, while well-meaning, simply is not supported by our law. Alimony is to be considered as a remedy to an actual insufficiency in the marital assets, not as a contingency for a possible insufficiency in the future.
¶ 36. We find no merit to Lecia’s argument. “If there are sufficient assets to provide for both parties, then there is no more to be done.” Carter v. Carter, 98 So.3d 1109, 1112 (¶ 8) (Miss.Ct.App.2012). It is only when the division of marital assets results in a deficit for one party that the chancery court should consider alimony. Id. The chancellor found that the distribution of marital assets adequately provided for both parties and that alimony was not warranted. Therefore, we find no error in the chancery court’s failure to reserve jurisdiction over the matter.
IV. Whether the chancery court abused its discretion in excluding the expert testimony of Dennis Horn.
¶ 37. Dennis Horn, an attorney, had provided Lecia with legal advice regarding her disability policies and requirements. Lecia sought to introduce Horn as an expert witness at trial. However, Kurt objected to Horn’s expert testimony at trial, “because the law does not recognize expertise in the practice of law.” The chancellor agreed, finding that testimony by Horn as to how the policy would be applied or interpreted would be “speculative” and “possibly unreliable.” When the chancellor stated that she would allow Horn to testify as a fact witness, Kurt again objected, as Horn had not been listed as a fact witness in discovery. The chancery court sustained the objection based upon “lack of supplementation indicating that this witness would be called not only in expert status[,] but also in fact status and/or with relevant facts with which to add to the presentation^]” The chancellor did allow Horn’s testimony to be proffered.
¶ 38. Lecia argues that Horn’s expert testimony regarding “the normal and customary actions of disability carriers” should have been admitted. Horn was to give his opinion that a van Lecia had observed near her home “was likely someone conducting surveillance of her on behalf of Northwestern.” Lecia also claims that Horn “should have been allowed to testify as to what he advised Lecia to do in order to minimize the possibility of termination of her payments[.]”
¶ 39. Mississippi Rule of Evidence 702 governs the admissibility of expert testimony, providing:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may *526 testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
“Relevancy and admissibility of evidence are largely within the discretion of the trial court[,]” and the trial court’s decision will only be reversed “where that discretion has been abused.” Terrain Enters., Inc. v. Mockbee, 654 So.2d 1122, 1128 (Miss.1995) (quoting Hentz v. State, 542 So.2d 914, 917 (Miss.1989)). We agree with the chancery court’s conclusion that the “expert” information offered by Horn (i.e., how litigation concerning disability claims could last up to two years, and how insurance companies often conduct surveillance on claimants) was speculative and not based on any sufficient facts or data or reliable principles or methods. Counsel for Lecia acknowledged at trial: “The purpose of Mr. Horn’s testimony is to discuss his experience in these types of actions and what could happen and what may happen in the event [Lecia] does certain things. And if this does happen, what are her consequences after that?” (Emphasis added). Accordingly, we find no abuse of discretion in the chancellor’s decision to exclude Horn as an expert witness.
¶ 40. Horn was also excluded as a fact witness due to Lecia’s failure to include him as such in the scheduling order. As we have already stated, a trial court has “considerable discretion” in managing pretrial discovery. See Bowie, 861 So.2d at 1042 (¶ 14). Lecia does not dispute that Horn was not listed as a fact witness in discovery according to the scheduling order. Therefore, we find no abuse of discretion in the chancellor’s decision to exclude Horn as a witness.
Y. Whether the chancellor’s finding that Kurt was not obligated to pay educational expenses for the children upon emancipation was manifestly in error.
¶ 41. The chancery court clarified its final judgment, concluding that it had “no authority to require Kurt to provide college support beyond emancipation.” Lecia claims that the chancery court committed manifest error when it found that “absent an express agreement, Kurt could not be required to pay post-majority college expense” for the couple’s children. Kurt maintains that the chancery court’s determination was in accordance with the applicable law.
¶ 42. We find no manifest error in the chancellor’s findings. As the supreme court recently stated in Hays v. Alexander, 114 So.3d 704, 707 (¶ 12) (Miss.2013), a parent has no statutory or common-law duty to support a child who has reached the age of majority. However, the courts’ lack of authority to require that a parent provide post-majority support does not preclude “the enforceability of agreements by the parties providing for the post-emancipation care and maintenance of their children, whether those agreements are separate contracts, or have been incorporated into the divorce decree.” Nichols v. Tedder, 547 So.2d 766, 770 (Miss.1989).
¶ 43. Nothing in the record demonstrates that the parties entered into an express contractual agreement that Kurt would be responsible for the children’s educational expenses post-majority. At trial, when asked who should be ordered “to pay for the children’s college expenses through emancipation,” Kurt replied, “I have agreed to previously and continue to want to pay for all of the children’s college expenses.” (Emphasis added). Later, at the hearing on the post-judgment motion to clarify or amend, Kurt’s counsel noted:
*527 “[T]he question isn’t whether Kurt Bue-chler intends to pay but whether the Court should order him to pay.” Counsel further argued that “[a]greeing to pay without restrictions is not an agreement to pay beyond emancipation.”
¶ 44. While the temporary order states that Kurt is to pay for the children’s “continued” educational expenses, it does not state with specificity that Kurt is to provide child support past emancipation. Furthermore, the temporary order cannot be construed as an agreement between the parties; it is a court-imposed judgment. Lecia also acknowledges in her brief that Kurt “impliedly agreed to pay post-majority college expenses[.]” (Emphasis added).
¶ 45. Accordingly, we find no merit to this issue.
¶ 46. THE JUDGMENT OF THE CHANCERY COURT OF MADISON COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING, P.J., ISHEE, ROBERTS, MAXWELL AND FAIR, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS, P.J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.

. Since it was a Mississippi Rule of Civil Procedure 59 motion, Lecia was required to file the motion ten days after the judgment, which was February 18, a Saturday. She filed it on Tuesday, February 22, because Monday, the 21st, was Presidents' Day.

. Killian later attended Boston College.