# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2012-CA-01380-SCT

*UNION CARBIDE CORPORATION*

*v.*

*RUSSELL E. NIX, JR., AS EXECUTOR OF THE*
*ESTATE OF RUSSELL E. NIX, SR.*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/26/2012 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | LAURA DEVAUGHN GOODSON |
| | MARCY BRYAN CROFT |
| | THOMAS PEYTON SMITH |
| | ELIZABETH BARNWELL KELLY TURLEY |
| | MICHAEL GEORGE TERRY |
| ATTORNEYS FOR APPELLEE: | GLENN GATES TAYLOR |
| | CHRISTY MICHELLE SPARKS |
| | JAMES COLLINS FERRELL |
| | C. GRANT HEDGEPETH |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART AND REMANDED - 06/05/2014 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KING, JUSTICE, FOR THE COURT:**

¶1.     After receiving a diagnosis of mesothelioma, Russell Nix filed suit against Union

Carbide based on his exposure to its asbestos products.  The jury returned a verdict for Nix

on his inadequate warning claim, awarding Nix $250,000 in compensatory damages and $500,000 in punitive damages. The trial court then awarded Nix nearly $500,000 in attorney's fees and costs. Aggrieved, Union Carbide appeals. This Court affirms the jury's award of compensatory damages, reverses the jury's award of punitive damages, vacates the award of attorney's fees, and remands the case for a new trial on punitive damages.

## FACTS AND PROCEDURAL HISTORY

¶2.     Russell Nix, Sr. worked for WellTech, a drilling company, from approximately 1980 to 1986. His job duties included maintaining the viscosity of drilling mud. Two Union Carbide products, Visbestos and Super Visbestos, were used to help maintain the viscosity of drilling mud. These two products were ninety-nine-percent asbestos. Nix used an average of ten to twelve fifty-pound bags of Super Visbestos to mix the drilling mud and also to increase viscosity during loss circulation events, and did so for several hours on most days for approximately two-and-a-half years.[1] These actions created asbestos dust.

¶3.     In the late 1960s, Montello and Union Carbide combined forces to supply Visbestos and Super Visbestos as drilling mud products. Union Carbide manufactured the products, and Montello was their exclusive distributor. Correspondence between the two indicated that Union Carbide often took it upon itself to advise Montello as to whether and what safety information to provide its customers.

¶4.     In June 1968, Union Carbide began labeling its asbestos products stating

Warning: Breathing Dust May Be Harmful

---

[1]After two-and-a-half years, Nix was promoted and, while he still handled the Super Visbestos, he did so less frequently, perhaps two to three times a week.

Do Not Breathe Dust

In 1972, OSHA promulgated standards that companies involved with asbestos were required to follow. 29 C.F.R. § 1910.1001 (1972). OSHA considered, but rejected, placing the words "cancer" and "danger" on the warning, because they were "unwarrantedly alarming." *Id.* The standards mandated that products containing asbestos be labeled, and further mandated that the exact wording of the label be:

Caution

Contains Asbestos Fibers

Avoid Creating Dust

Breathing Asbestos Dust May Cause Serious Bodily Harm

*Id.* The label was to "be printed in letters of sufficient size and contrast as to be readily visible and legible." *Id.* In June 1972, when this OSHA standard was promulgated, Union Carbide changed its warnings to comply with the OSHA wording, with its label stating verbatim the words mandated by OSHA. While Montello made the bags in which Visbestos and Super Vistbestos were packaged, Union Carbide was the final decision-maker with regard to the appearance and labeling of the bags.

¶5.     In 1983, a Union Carbide internal correspondence stated that "[i]t is widely recognized that the mandated [OSHA] label understates the risk associated with exposure to asbestos dust, and for this reason, it is proposed that the attached label be substituted for the OSHA label on all UCC asbestos products." The "attached label," as well as one developed a few weeks later, used stronger language than did the OSHA regulation, specifically mentioning that asbestos is a "cancer hazard" and the use of respirators. Other Union

3

Carbide correspondence in the 1970s and 1980s made clear that Union Carbide recognized the risk of cancer from breathing asbestos dust.

¶6.     In the 1990s, Nix was involved in asbestos litigation against several defendants, Union Carbide included.  Nix and Union Carbide settled, and Nix signed a "Partial Release."  On December 14, 1998, Nix released Union Carbide

> of and from any and all claims, causes or rights of action, demands and damages of every kind and nature whatsoever, including, without limitation, all present and future claims that [Nix] may now or hereafter have including any and all asbestos-related diseases, injuries, cancers, and/or malignancies, now or arising hereafter, including, but not limited to, loss of consortium, companionship, service, support, pain and suffering, injury and damage of any kind, including the wrongful death of [Nix], which [Nix] may now or hereafter have arising out of or being in any way related to the possible exposure of [Nix] to asbestos or asbestos-containing products mined, manufactured, sold, supplied, or distributed by [Union Carbide], which may have caused injuries or damages to them either jointly or severally, except as may be preserved . . . below.

The Partial Release expressly exempted claims for mesothelioma not diagnosed as of the date of the execution of the release.[2]

¶7.     In 2010, Nix was diagnosed with mesothelioma.[3]  On August 25, 2010, Nix filed suit against multiple defendants for, inter alia, negligence, design defect, and inadequate warning, relating to his exposure to asbestos.  On January 20, 2011, Nix amended his complaint, including adding Union Carbide as a defendant.  Eventually, all defendants were dismissed except Union Carbide.  Trial in the matter began on October 3, 2011, on Nix's claims for

---

[2]"[W]e specifically do not release, claims for . . . mesothelioma . . . not diagnosed at the time of the execution of this Partial Release."

[3]Union Carbide does not contest Nix's mesothelioma diagnosis.  Nix died from mesothelioma on January 14, 2012.

inadequate warning and design defect under the Mississippi Products Liability Act.[4]

¶8.     At trial, Edward Ziegler testified for Nix as an expert in the drilling industry, products used in the drilling industry, and warnings and safety. Ziegler is a petroleum engineer who owns a safety and petroleum consulting firm and a small oil company. He had worked in the drilling industry since he was fifteen years old. He received a Bachelor of Science degree in petroleum and natural gas engineering in 1972, and has been through numerous training programs and seminars regarding drilling. He received a master's degree in safety engineering from an unaccredited distance learning university. Ziegler has also completed the "OSHA 500" program several times, which qualified him as an OSHA instructor. Specific to warnings, Ziegler has "been through National Safety Council training and other seminars dealing with warnings and instructions." He stated that one of his courses on warnings was one week long, and that he attended "several several-day seminars" on warnings. He also had "on-the-job training" regarding warnings in working with his consulting clients. Additionally, he has written warnings for products that he sells and/or designs. Ziegler admitted that he had never written any peer-reviewed articles regarding warnings, nor had he performed any testing of warnings that he had written. He did, however, note that he had watched people in the field using equipment for which he had written warnings. Ziegler admitted that he had not obtained any peer-reviewed articles on warnings, the testing of warnings, or the efficacy of warnings. He further admitted that he was not trained in psychology, and the court cut off questioning regarding his training in human

---

[4]Prior to trial, most evidentiary rulings were made by a special master, as agreed to by the parties.

factors. Union Carbide ultimately objected to Ziegler being accepted as an expert on warnings. The court overruled the objection and stated that Union Carbide would be able to cross-examine Ziegler on the warnings issues.

¶9.     Ziegler testified that Union Carbide's warnings on the Visbestos and Super Visbestos bags were inadequate.[5] He stated that, in his opinion, the warnings did not satisfy the OSHA standard that mandates "that warnings have to have – the warnings have to have certain color and contrast on the bag."[6] He noted that the letters were "relatively small, some of the smallest letters on the whole bag." He continued that the warning fails to attract attention, inform of the hazard, inform how to avoid the hazard, and indicate what the results of the hazard are. He specifically criticized the warning for failing to use the word "cancer," failing to instruct the handler to wear a respirator, and failing to use the word "warning." He noted that the product inherently creates dust, and that the instruction to avoid creating dust is "a useless piece of information. It doesn't tell you how to avoid the hazards of these product [sic] because they create dust every time you use them. So you can't avoid the dust. But that also doesn't tell you how to avoid dust. It doesn't tell you how to not make dust." However, his later testimony was that he could not come up with an alternate warning, because *no* warning would be sufficient due to the inherent danger of the product.

¶10.    Nix testified at trial and stated that he had read the warning provided. He noted that

---

[5]Ziegler also testified that the products' designs were defective and that the products did not meet the OSHA standards in that regard.

[6] The OSHA standard mentions nothing about color. It states that warnings must "be printed in letters of sufficient size and contrast as to be readily visible and legible." 29 C.F.R. §1910.1001 (1972).

it was "impossible" to avoid creating dust,[7] and that he did not use a respirator or dust mask while using the product because "nobody told me."  Regarding respirator use and whether he was apprised of the cancer risk of Super Visbestos, he testified as follows:

> Q: Now, had that bag contained a warning telling you to use a respirator, what changes, if any, would you have made in the way you handled that product?
>
> A: I would have had them out there if I'd of had to bought them out of my pocket.
>
> Q: Would you have worn a respirator?
>
> A: I would have.
>
> Q: Even if it didn't mention the need for a respirator, if it had told you that it would cause cancer or could cause cancer, what changes, if any, would you have made in the way you handled that product?
>
> A: I would have probably tried to got out of that job where I wouldn't have had to handle it.
>
> Q: Okay.
>
> A: Knowing – based on what I know about cancer and seeing my mother die with cancer and my second wife died with cancer and I'm dying with cancer.
>
> Q: Have you ever been a smoker?
>
> A: No.  No.  Didn't like cigarettes.  Scared of them.

---

[7]Ziegler also testified that dust creation is inherent in the use of the product: "Well, it's always dusty.  You have a powdered material.  You're intentionally, because this is how you have to use it, cutting or breaking a paper sack open and dumping the material out in the atmosphere or environment into a hopper.  So to use the product as it was manufactured and sold, you are creating dust.  Every time you dump a bag, you get dust."  He also stated that the products "create dust every time you use them.  So you can't avoid the dust."  The record indeed indicates that the products were inherently dusty to some extent. Even Union Carbide admits that it strove to create a "dust-free" product, and was unsuccessful, indicating that some amount of dust would always be associated with these products.

On cross-examination, he testified as follows:

Q: Okay. Now, do you remember seeing any warnings on the packages prior to 1985?

A: Oh, yeah. Yes.

Q: Have you testified on another occasion that you started seeing the warnings on the packages in 1985?

A: I probably did testify, I'd say yes.

Q: Is that true?

A: Yes.

Q: Okay. So prior to 1985 you hadn't noticed the warnings, right?

A: Well, yes, they were on there.

Q: But you hadn't noticed them or observed them?

A: I probably did and didn't pay any – didn't take it to heart.

Q: Didn't pay any attention to it?

A: Probably not.

Q: Did you take any precautions once you saw the warning that said asbestos can cause serious bodily harm?

A: I don't remember ever taking any precaution, no.

¶11. After a lengthy trial, the jury ultimately returned a verdict for Union Carbide on the defective design claim and a verdict for Nix on the inadequate warning claim. The jury awarded Nix $1,000,000 in damages. The special verdict form provided that if damages were awarded, "100% represents the total causes of Mr. Nix's injury. Please assess the appropriate percentage of fault to the parties and entities identified below, following the

8

instructions provided[8] and based upon the preponderance of the evidence presented to you."

The special verdict form listed more than forty entities, and next to each was a blank line

with a percentile symbol. At the bottom, it had a line entitled "Total" and stated that the total

---

[8]The jury instructions stated that

. . .

Alternatively, if after considering all of the evidence, you find that at least one of the proximate causes of the damages of the plaintiff, including emotional distress damages, was the plaintiff's exposure to products other than those manufactured or sold by the defendant, then you must allocate an appropriate percentage of fault to those companies and causes on your verdict form if you do actually find in favor of the plaintiff and award damages.

With respect to damages, however, you are instructed that the first question you must decide is whether the defendant is legally liable to the plaintiff under the instructions given to you by the Court. Only if you determine that the defendant is legally liable to the plaintiff, should you even consider the question of monetary damages. . . .

Should you determine that the plaintiff is entitled to recover damages, you must next determine the amount of damages to be awarded. . . . .

. . .

Furthermore, if you determine that the defendant is legally liable to the plaintiff and determine an amount of damages to be awarded to the plaintiff, you are next required by law to determine the percentage of fault that is to be assessed to each individual or entity that you determine to be at fault for the plaintiff's injuries and indicate that percentage of fault on the form of the verdict that will be given to you separately. This is because if you award damages to the plaintiff at all, you are not limited to the parties before the Court in your determination of percentages of fault. You may also assess a percentage of fault to persons or entities who are not here in the Court.

You are instructed that, if you find from a preponderance of the evidence that the plaintiff's exposure to products not manufactured by Union Carbide, plaintiff's employers, . . . , the mud companies, the oil companies, or any other third party was also guilty of fault which proximately contributed to the plaintiff's injuries, then you shall and must determine the amount or percentage of fault attributable to such other persons or entities which combined to cause the plaintiff's injuries. If you decide to award damages, your total percentages of fault assigned to each of the entities you find to be liable must add up to a total of 100%.

9

"Should Equal 100." The jury allocated twenty-five-percent fault to Union Carbide, and allocated various percentages of fault to other entities.

¶12. After the jury returned the detailed verdict form, counsel for Nix stated that they believed that there may have been confusion with the jury verdict form.[9] Nix requested that the judge "ask the jury if they intended to award the $1,000,000 to the plaintiff as against Union Carbide or did they intend for the $1,000,000 to be the total amount against all of the entities on the verdict form." Union Carbide objected. The court overruled the objection. Nix then created a "questionnaire" to submit to the jury, which stated "Did you intend to award $1,000,000 to the plaintiff as against Union Carbide only or did you intend for the $1,000,000 to be the total as to all entities on the verdict form?" The *court* then demanded that Nix add the following to the "questionnaire": "the way the verdict stands now, the Court understands the verdict now is that you awarded – the way the verdict is – the way it stands now, the Court will accept that you *only* awarded $250,000 to Mr. Nix against Union Carbide." (Emphasis added.) The ultimate "questionnaire" that went to the jury stated:

> Did you intend to award $1 million dollars to the Plaintiff as against Union Carbide only, or did you intend for the $1 million to be the total as to all entities on the verdict form? The way it stands now the Court understands that you *only* awarded $250,000 as to Union Carbide? What ever your answer is 9 of you must agree.

(Emphasis added.)

¶13. The jury responded with a note that stated "We intended to award $1 million dollars

---

[9]It appears from the record that this special verdict form that Nix believed caused confusion was submitted by Nix. However, Union Carbide indicated that this form was ordered by the special master and was a compromise, but has "been used [by the court] in every case."

to the Plaintiff to be the total as to all entities on the verdict form. We awarded $250,000 as to Union Carbide. All jurors agree." When the jurors returned the note, the following colloquy occurred:

> THE COURT: Ms. Sims, some of the lawyers wanted to know, you know, how you reached your verdict and what your intent was, so if you'll just tell us. That's all you have to do is tell us what it is.
>
> JUROR SIMS: Well –
>
> THE COURT: Just tell us what your response to the question I sent in is.
>
> JUROR SIMS: All right. We intended to award the $1,000,000 according to the percentages that were on the form which was $250,000 as to Union Carbide.
>
> THE COURT: As to Mr. Nix? That's what you intended to award Mr. Nix? Is that what you intended Mr. Nix to receive from Union Carbide, $250,000?
>
> JUROR SIMS: Yes, sir.

The court then immediately submitted the issue of punitive damages to the jury. The jury awarded Nix $500,000 in punitive damages.

¶14.    On October 28, 2011, Nix filed a Motion for Award of Costs, Expenses, Attorney's Fees, and Other Relief. Nix requested costs of court in the amount of $1,239.85, expenses in the amount of $284,067.08, and $601,080.87 in attorney and paralegal fees. Attached to the motion were exhibits detailing the expenses and fees. The court summarily awarded Nix $466,965 in attorney's fees and costs consisting of the original filing fee of $121 and the plaintiff's portion of the special master fees in the amount of $4,451.44. It gave no explanation for the amount awarded, nor did it make any findings of fact on the same, either in the written judgment or at the hearing on attorney's fees. The court also awarded post-

11

judgment interest at the rate of eight percent per annum, to accrue from October 12, 2011, the day after the jury verdict.

¶15. Union Carbide filed a Motion for Judgment Notwithstanding the Verdict (JNOV), or in the Alternative, for Remittitur. The court denied the motion, and Union Carbide filed its notice of appeal. On appeal, Union Carbide raises several issues:

1) Whether Nix failed to prove a prima facie product liability failure-to-warn claim because:

a) Union Carbide did not owe Nix a duty to warn, as it provided warnings to companies like Nix's employer, who was a sophisticated user;

b) Union Carbide did not breach any duty to Nix because its warning complied with OSHA regulations and because Nix failed to prove that the warning's presentation or prominence were inadequate;

c) Nix failed to adduce competent expert testimony establishing a failure-to-warn claim;

d) Nix failed to prove a deficient warning proximately caused his injury because he did not rely on the warning as it was;

2) Whether punitive damages were improper because:

a) Nix failed to prove by clear and convincing evidence that Union Carbide acted with actual malice or gross negligence that exhibited a willful, wanton, or reckless disregard for the safety of others, or committed actual fraud;

b) Nix released Union Carbide from liability for punitive damages in a prior settlement;

c) the trial court improperly influenced the jury's award of punitive damages;

3) Whether the award of attorney fees and costs is improper because:

a) it is unsupported by a valid punitive damages award;

12

b) it is unsubstantiated by any findings of fact; and

4) Whether the post-judgment interest rate is improper.

# ANALYSIS

## 1. Standard of Review

¶16.    This Court reviews a denial of a motion for JNOV using the same standard as did the trial court. *United Services Auto. Ass'n v. Lisanby*, 47 So. 3d 1172, 1176 (Miss. 2010). This Court views the evidence in the light most favorable to the nonmoving party. *Id.* The Court gives the nonmoving "party the benefit of all favorable inferences that may be reasonably drawn from the evidence." *3M Co. v. Johnson*, 895 So. 2d 151, 160 (Miss. 2005) (quoting *Munford, Inc. v. Fleming*, 597 So. 2d 1282, 1284 (Miss. 1992)). This Court will reverse the denial of a JNOV *only* if the facts are so overwhelmingly in favor of the moving party that reasonable jurors could not have arrived at a verdict against the moving party. *Johnson*, 895 So. 2d at 160. Therefore, if substantial evidence, in other words, "evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions," exists supporting the verdict, this Court must affirm the trial court's denial of a JNOV. *Id.* In summary, a motion for JNOV does not test the weight of the evidence, but the legal sufficiency of the evidence supporting the verdict. *Id.*

¶17.    The standard of review regarding whether an award of attorney's fees is proper is abuse of discretion. *Tupelo Redevelopment Agency v. Gray Corp., Inc.*, 972 So. 2d 495, 518 (Miss. 2007). This Court also reviews issues regarding post-judgment interest for abuse of discretion. *See Houck v. Ousterhout*. 861 So. 2d 1000, 1003 (Miss. 2003).

13

### 2. Whether Nix failed to prove his product liability failure-to-warn claim

¶18.    A manufacturer is liable under a failure-to-warn theory if the product "failed to contain adequate warnings," the inadequate warnings "rendered the product unreasonably dangerous to the user or consumer," and the inadequate warning "proximately caused the damages for which recovery is sought." Miss. Code Ann. § 11-1-63(a)(i)-(iii) (Rev. 2004); *Johnson*, 895 So. 2d at 166.   Furthermore, the plaintiff must prove by a preponderance of the evidence that the manufacturer "knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition." Miss. Code Ann. § 11-1-63(c)(i) (Rev. 2004); *Johnson*, 895 So. 2d at 166.  Furthermore,

> [a]n adequate product warning . . . is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary knowledge common to an ordinary consumer who purchases the product.

Miss. Code Ann. § 11-1-63(c)(ii); *Johnson*, 895 So. 2d at 166.

*a. Sophisticated User/Learned Intermediary Defense*

¶19.    Union Carbide claims that it owed Nix no duty to warn about the potential hazards of asbestos because it reasonably relied on purchasers "like Plaintiff's employer WellTech" to provide appropriate warnings and instructions to end users such as Nix.

¶20.    "Mississippi recognizes both a statutory and the common-law 'sophisticated-user' defense." *Miss. Valley Silica Co., Inc. v. Eastman*, 92 So. 3d 666, 671 (Miss. 2012). "[C]ourts and litigants often use the terms 'learned intermediary' and 'sophisticated user' interchangeably." *Id.* The "sophisticated-user" terminology is more appropriate where the

14

injured ultimate user is aware of the product's hazards, while the "learned intermediary" terminology more aptly describes the situation in which the intermediate purchaser is knowledgeable, but the injured ultimate user is ignorant of the product's hazards. *Id.* "[T]he context and facts of a particular case will dictate which label is appropriate, regardless of the label actually used." *Id.*

i. Common Law

¶21.    The common law defense provides that when a manufacturer provides information to a third party upon whom it can *reasonably* rely to communicate that information to the ultimate end user or those parties who will be exposed to the product's hazardous effects, its duty to warn may be discharged. *Id.* at 672. Union Carbide points to many communications it and Montello had with various companies regarding "safe" asbestos practices, that breathing asbestos should be avoided, and other similar topics.  However, it points to absolutely nothing that shows that it or Montello informed *WellTech*, Nix's actual employer, or anyone in WellTech's direct distribution chain, of these hazards.  To use the common law sophisticated-user defense, a manufacturer must provide some evidence that it actually provided the "learned intermediary" in question with any information or warning. *See Swan v. I.P., Inc.*, 613 So. 2d 846, 851-56 (Miss. 1993); *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 675-76 (5th Cir. 1999) (applying Mississippi law, and contrasting the case with *Swan* "where it was unclear whether the manufacturer ever provided the intermediary with information on the product" because, in the case at hand, the manufacturer directly provided the employer "with extensive information on the dangers" of the product).  Union Carbide points this Court to no evidence that it specifically provided WellTech or anyone in its direct

15

chain of distribution with information regarding the hazards of asbestos. It certainly cannot then claim that it reasonably relied on WellTech to warn Nix, when it is unclear from the record whether it even provided WellTech with a warning. Thus, the trial court properly denied the motion for JNOV on this issue.

ii. Statutory Law

¶22. The statutory sophisticated-user defense provides that the manufacturer is not liable "if the danger posed by the product is known . . . to the user or consumer of the product, or should have been known . . . to the user or consumer of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons who ordinarily use or consume the product." Miss. Code Ann. § 11-1-63(e) (Rev. 2004); *Eastman*, 92 So. 3d at 972-73. Section 11-1-63 does not define the word "user." This Court has not determined whether, in a case such as this, the "user" is the employer who "used" the product in its business, or the employee who ultimately "used" the product on the job. *Eastman*, 92 So. 3d at 973.

¶23. Union Carbide argues that the ordinary "consumers" of Super Visbestos were large oil companies and mud companies, and the ordinary "users" of the product were drilling contractors like WellTech. Nix counters that Union Carbide presented no evidence that WellTech was aware that Super Visbestos caused cancer or mesothelioma. Moreover, he points to evidence showing that Union Carbide downplayed the dangers of asbestos to its consumers, and that it does not appear to have ever recommended across-the-board respirator

16

use.[10]

¶24.    This Court does not need to determine how to define "user" in this case. Regardless of how it is defined, Union Carbide presented evidence that it informed some of its purchasers of some of the dangers of asbestos (although it presented nothing specific to WellTech), and Nix presented evidence showing that Union Carbide often downplayed the dangers of asbestos to its purchasers. Given the conflicting evidence, reasonable jurors could differ regarding whether the information Union Carbide gave to its customers, as a whole, adequately warned of the dangers of asbestos. Thus, the trial court's denial of the motion for JNOV on this issue was not error.

*b. Union Carbide did not breach any duty to Nix.*

¶25.    Union Carbide argues that, even if it had a duty to warn Nix of the dangers of asbestos, it did not breach that duty.

i. OSHA Standard

¶26.    Union Carbide argues that, because it complied with the OSHA standard, and the OSHA standard cautioned against the hazard at issue, its warning "was adequate as a matter of law."

¶27.    First, while it is clear that Union Carbide's warning tracked the language of the OSHA standard, the OSHA standard also requires that the warning "be printed in letters of sufficient size and contrast as to be readily visible and legible," a subjective standard. 29 C.F.R. § 1910.1001 (1972). Because a portion of the OSHA standard is subjective, Union Carbide

---

[10]It did recommend respirator use under certain specific scenarios, but not as a general practice when handling its asbestos products.

17

cannot argue that it was in perfect compliance with the standard merely because the words it used were those mandated by the standard.

¶28. Second, compliance with OSHA standards may be used as evidence of the reasonableness of Union Carbide's actions, but it is not dispositive. *See **Accu-Fab & Constr., Inc. v. Ladner***, 778 So. 2d 766, 771 (Miss. 2001) (OSHA regulations admissible to show reasonableness), *overruled on other grounds by **Mack Trucks, Inc. v. Tackett***, 841 So. 2d 1107 (Miss. 2003); *see also **Sumrall v. Miss. Power Co.***, 693 So. 2d 359, 366-67 (Miss. 1997) (OSHA regulations not admissible to show negligence because they are not given compulsory force by the Mississippi Legislature).

¶29. The OSHA regulations were presented to the jury, along with Union Carbide's warning. The jury considered the regulations as evidence of the adequacy of Union Carbide's warning and rejected Union Carbide's theory. Given the internal Union Carbide documents acknowledging that the OSHA warning was inadequate, a reasonable jury could certainly reach the conclusion that compliance with OSHA did not automatically render Union Carbide's warning adequate. Moreover, the jury was able to view the warnings itself to determine whether Union Carbide's warnings were "printed in letters of sufficient size and contrast as to be readily visible and legible," as required by OSHA, and it is entirely plausible that the jury decided that the warnings were noncompliant in this subjective regard. Thus, the trial court properly denied Union Carbide's motion for JNOV on this issue.

ii. Nix failed to prove the warning was inadequate due to presentation or prominence.

¶30. Union Carbide also argues Nix failed to establish a failure-to-warn claim by arguing that the warning label was inadequate due to prominence. In cases where a warning is of the

18

nature "that it causes a potential plaintiff to fail to read the warning which causes his injuries," the warnings are thus "potentially inadequate because they are presented in a manner that prevents the customer from reading them and being warned." *Palmer v. Volkswagen of America, Inc.*, 904 So. 2d 1077, 1085 (Miss. 2005) (quoting *E.R. Squibb & Sons, Inc. v. Cox*, 477 So. 2d 963, 970 (Ala. 1985)).

¶31.    Union Carbide also claims that Ziegler's expert testimony was the only evidence to support this inadequate warning claim, and his opinion is "devoid of any substance." This contention has no merit, as discussed in Issue iii. "Expert Testimony."

¶32.    Furthermore, Union Carbide claims that Nix cannot claim that the warning was inadequate due to presentation or prominence because he actually saw and read the warning. Nix did admit that he saw and read the warning. However, the jury did not necessarily find the warning inadequate due to presentation or prominence. Many other potential inadequacies of the warning were presented, such as the warning failing to use the word "cancer" and failing to direct users to use a respirator. Further, much evidence was adduced that the warning to "avoid creating dust" was meaningless, because it was impossible to avoid creating dust when using the product. The jury could have determined that any one of these issues rendered the warning inadequate, not necessarily its presentation or prominence. Thus, any failure to prove the same is not fatal to Nix's claim, and the trial court properly denied Union Carbide's motion for JNOV on this issue.

iii. Expert Testimony

¶33.    Union Carbide argues that Nix's failure-to-warn claim cannot stand because "it was wholly unsupported by competent, admissible expert proof." "The admission of expert

19

testimony lies within the sound discretion of the trial court." ***Matter of the Extension of the Boundaries of the City of Tupelo***, 94 So. 3d 256, 267 (Miss. 2012). Mississippi Rule of Evidence 702 provides that

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

M.R.E. 702. Thus, the trial court must determine that the expert testimony is both relevant and reliable. ***Miss. Transp. Comm'n v. McLemore***, 863 So. 2d 31, 38 (Miss. 2003). This Court has adopted the ***Daubert***[11] standard to determine the reliability of expert testimony, as modified by ***Kumho Tire***.[12] ***McLemore***, 863 So. 2d at 35-38. Because the trial court is vested with gatekeeping responsibility, it must make a preliminary assessment regarding the scientific validity of the reasoning or methodology underlying the expert testimony and the proper application of that reasoning or methodology to the facts of the case at issue. ***Id.*** at 36. ***Daubert*** set forth a nonexhaustive, illustrative list of factors to use to determine the reliability of expert testimony. ***Id.*** The focus of analyzing these factors is on principles and methodology, not on the conclusions. ***Id.*** at 36-37. The factors

> include whether the theory or technique can be and has been tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or potential rate of error; whether

---

[11]***Daubert v. Merrell Dow Pharms., Inc.***, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

[12]***Kumho Tire Co. v. Carmichael***, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

20

there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Id.* at 37. The inquiry is flexible, and depends on "the nature of the issue, the expert's particular expertise, and the subject of the testimony." *Id.* An expert must exercise "the same level of 'intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Id.* at 37-38 (quoting **Kumho Tire**, 526 U.S. at 152).

¶34. Union Carbide claims that Ziegler's testimony regarding warnings was not admissible because it was not reliable. It argues that he has never authored peer-reviewed articles on warnings, has never taught or instructed on how to draft warnings, has never conducted any testing on warnings, and has never applied any scientific method to his analysis of Union Carbide's warning.[13] It claims that "[e]xpert testimony is a prerequisite to establishing a product liability claim under Mississippi law." Thus, it claims, "[t]he complete lack of requisite expert proof is fatal to Plaintiff's claims as a matter of law." This assertion is incorrect and misleading, as expert testimony is not always required to prove a failure-to-warn claim.

¶35. "The issue of a warning's adequacy is factual and usually will be resolved by the trier of fact." **Wyeth Laboratories, Inc. v. Fortenberry**, 530 So. 2d 688, 692 (Miss. 1988). "Expert testimony *may* be necessary to assist the trier of fact to understand the evidence or determine a fact in issue *when the issue presented requires scientific, technical or other*

---

[13]Notably, it does not appear that Union Carbide actually challenged Ziegler with any peer-reviewed articles, testing, or scientific methods. *See* **City of Tupelo**, 94 So. 3d at 271. **Daubert** is not a strict and exclusive test. *Id.*

21

*specialized knowledge*." *Id.* (emphases added). For example, the "terms and applications of a warning on [a prescription] drug, in order to have meaning, must be explained to a jury. This is a subject 'so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman.'" *Id.* (quoting ***Dion v. Graduate Hosp. of the Univ. of Penn.***, 520 A.2d 876, 881 (Pa. Super. 1987)). Thus, "[w]here the adequacy of the warning is not obvious to the ordinary layperson it is necessary to have expert testimony as to this issue." ***Fortenberry***, 530 So. 2d at 692.

¶36. The issues surrounding the adequacy of the warning in question are simple. It is clear that breathing asbestos may cause cancer, and it is clear that Union Carbide's warning did not state this. Internal Union Carbide documents even acknowledged that the warning was inadequate. It was also suggested that the warning should have mandated respirator use, and it did not do this. Specialized knowledge is not required to understand the issues regarding Union Carbide's warning, as the ordinary layperson can make these determinations himself. Thus, Ziegler's testimony on the warning issues was not necessary for Nix to prove the issue. This Court need not decide whether Ziegler was qualified as a warnings expert, because even the absence of his testimony is not fatal to Nix's failure-to-warn claim.

*c. The warning did not proximately cause Nix's injuries because Nix did not rely on the warning.*

¶37. Union Carbide argues that Nix failed to prove his failure-to-warn claim because he failed to prove that he relied on the given warning. Nix admitted that he read the warning, and did not do anything after reading it. Thus, Union Carbide surmises, Nix "did not rely on the warning or act upon it to take any preventative action, despite being warned of the

22

potential for serious bodily harm from breathing asbestos dust." Union Carbide notes that Nix did not try "to avoid creating or breathing asbestos dust in reliance on Union Carbide's warnings, either through safe work practices, the use of personal protective equipment, or by any other means."

¶38. "[R]eliance on the manufacturer's warning *may, or may not, be* an element of an inadequate warnings case." *Palmer*, 904 So. 2d at 1083. Such a determination depends on the facts of the case. "Complaints of inadequate warnings may charge that certain warnings which were not given, should have been given." *Id.* In those cases, reliance is not an element of an inadequate warnings case. *Id.* "[A] plaintiff can certainly not be expected to show reliance on a warning which was not given." *Id.* However, if a plaintiff complains that a given warning was defective, the plaintiff must have read and relied upon the defective warning to complain of it. *Id.*

¶39. Nix read the warning. Union Carbide asserts that he did not "rely" upon it, however; thus, urges Union Carbide, his inadequate warning claim must be defeated. Nix argues that the warning gave Nix nothing to "rely" upon. While Union Carbide claims that Nix did not attempt to avoid creating dust, ample evidence exists, including Union Carbide documents, that avoiding creating dust was impossible. Union Carbide cannot absolve itself of an inadequate warning by instructing users to do the impossible and then chastising them for not accomplishing the impossible. Furthermore, while Union Carbide asserts that Nix did nothing to avoid breathing dust, thus, it argues, he did not rely on the warning, the warning did not instruct Nix to avoid breathing dust, nor to do anything specific to avoid breathing dust. Union Carbide essentially argues that Nix failed to rely on instructions that did not

23

exist. In this regard, Nix is essentially arguing that "certain warnings which were not given," namely that asbestos causes cancer and that users should use a respirator, "should have been given." *Palmer*, 904 So. 2d at 1083. Indeed, Nix testified at length about his experience with family members with cancer, and stated that if the warning had used the word "cancer," he would have tried to find another job. He also testified that if the warning had instructed him to use a respirator or a mask, he would have done so. The trial court did not err in denying the motion for JNOV on this issue.

### 3. Punitive Damages

¶40. Union Carbide argues that punitive damages were inappropriate. Punitive damages may be awarded only if a compensatory damages award has been made against a party. Miss. Code Ann. § 11-1-65(1)(b) & (c) (Rev. 2004). To receive an award of punitive damages, a claimant must prove "by clear and convincing evidence that the defendant . . . acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. § 11-1-65(1)(a) (Rev. 2004). While the purpose of compensatory damages is to make the plaintiff whole, "the primary purpose of punitive damages is to punish the wrongdoer and deter similar misconduct in the future by the defendant and others." Miss. Code Ann. § 11-1-65(1)(e) (Rev. 2004). In determining the amount of punitive damages, the fact-finder shall consider:

> the defendant's financial condition and net worth; the nature and reprehensibility of the defendant's wrongdoing, for example, the impact of the defendant's conduct on the plaintiff, or the relationship of the defendant to the plaintiff; the defendant's awareness of the amount of harm being caused and the defendant's motivation in causing such harm; the duration of the

24

defendant's misconduct and whether the defendant attempted to conceal such misconduct; and any other circumstances shown by the evidence that bear on determining the proper amount of punitive damages.

*Id.*

*a. OSHA Standard*

¶41.　Union Carbide argues that its warnings were adequate as a matter of law because it followed the OSHA standard.　Thus, it maintains that Nix failed to prove that Union Carbide acted with actual malice or gross negligence that exhibited a willful, wanton, or reckless disregard for the safety of others or committed actual fraud.　While OSHA regulations may be used as evidence of reasonableness, as discussed *supra*, they are not dispositive.　Nix introduced evidence that Union Carbide knew that what OSHA required was inadequate and did nothing to change or supplement their warning.[14]　Union Carbide cannot now take refuge in the OSHA standard.　Moreover, as discussed *supra*, a portion of the OSHA standard was subjective and subject to interpretation by the jury.

¶42.　Additionally, the jury was specifically instructed that it could consider Union Carbide's OSHA compliance in a jury instruction given in the punitive damages phase:

> In considering whether or not the defendant's conduct was reprehensible, you may consider whether the defendant's conduct comported with state or federal regulations, such as OSHA.　You may also consider

---

[14]Union Carbide stated that "[i]t is widely recognized that the mandated [OSHA] label understates the risk associated with exposure to asbestos dust, and for this reason, it is proposed that the attached label be substituted for the OSHA label on all UCC asbestos products."　The proposed labels, which Union Carbide never used or submitted to OSHA, used stronger language than did the OSHA regulation, specifically mentioning that asbestos is a "cancer hazard" and the use of respirators.　Other Union Carbide documents made clear that Union Carbide understood that asbestos could cause cancer, despite the fact that Union Carbide did not label Visbestos or Super Visbestos as a cancer risk.

whether a defendant complied with or departed from applicable industry customs or standards.

I remind you that the sale of asbestos and asbestos-containing products was a lawful activity in this State and others at all relevant times that Plaintiff Nix was employed. You are not to punish the defendant merely because you may find that asbestos caused injury, or because that defendant knew or should have known of the potential risks associated with that product, but only to the extent that you find by clear and convincing evidence, if at all, that the plaintiff's harms were due to the defendant acting with actual malice or gross negligence that evinces a willful, wanton, or reckless disregard for others.

Thus, the jury was adequately instructed on how to consider compliance with OSHA standards in making its determination. Reasonable jurors could have come to different conclusions on this issue, given Union Carbide's knowledge of the inadequacy of OSHA's warning and its decision not to change or supplement its warning accordingly. Thus, the trial court did not err in denying the motion for JNOV on this issue.

*b. Release*

¶43. Union Carbide also claims that Nix released his punitive damages claims in the prior litigation because, it argues, punitive damages are conduct-specific, not disease-specific, and Nix released Union Carbide from any and all claims arising out of his exposure to asbestos. However, the release specifically excepted "claims for . . . mesothelioma . . . not diagnosed at the time of the execution of this Partial Release." The release does not specifically mention "punitive damages" in any capacity.

¶44. This Court applies contract law principles to settlement agreements. *Chantey Music Publ'g, Inc. v. Malaco, Inc.*, 915 So. 2d 1052, 1056 (Miss. 2005). Thus, when examining a settlement agreement, the Court must first examine the four corners of the document. *Rotenberry v. Hooker*, 864 So. 2d 266, 270 (Miss. 2003). If the settlement is clear and

26

unambiguous, then its intent must be effectuated. *Id.* Only if the settlement is vague and ambiguous, and the intent of the parties thus unclear, does the Court examine extrinsic evidence. *Id.* The settlement at issue clearly does *not* specifically state that Nix was releasing future claims for punitive damages, and it clearly exempts future claims for undiagnosed mesothelioma, which includes the case at hand.

¶45. Punitive damages do not exist in a vacuum. Absent a valid claim for compensatory damages, there can be no claim for punitive damages. *See* Miss. Code Ann. § 11-1-65(b) & (c); ***Rocanova v. Equitable Life Assur. Soc'y of the U.S.***, 634 N.E.2d 940, 945-46 (N.Y. 1994) ("[a] demand or request for punitive damages is parasitic and possesses no viability absent its attachment to a substantive cause of action"). Without specific language in the release releasing the punitive damages claims that are tethered to the exempted future claims for mesothelioma, it cannot be said that the language of the release clearly and unambiguously releases Union Carbide from liability for these punitive damages. Future claims for mesothelioma were excepted from release, and their attendant "parasitic" punitive damages claims were also excepted.

*c. Improper Influence*

¶46. Union Carbide argues that the judge improperly influenced the jury verdict on punitive damages by implying that the compensatory damages award was insufficient. It claims that the special verdict form was specific and unambiguous, as was the jury verdict itself, thus "there was no proper basis for intervention or comment by the trial judge." Yet, the judge determined that it was necessary to "clarify" the jury's verdict, and in doing so, made sure to add into the jury questionnaire the word "only" to modify the amount the jury

27

awarded, stating that the court understood that the jury "only awarded $250,000 as to Union Carbide." When the jury again clearly indicated the award, the judge continued to question the jury as to the award. Immediately thereafter, the court submitted the question of punitive damages to the jury.

¶47. "It is a matter of common knowledge that jurors . . . are very susceptible to the influence of the judge." *Green v. State*, 53 So. 415 (Miss. 1910). "[J]urors watch closely his conduct, and give attention to his language, that they may, if possible, ascertain his leaning to one side or the other, which, if known, often largely influences their verdict." *Id.* A judge "cannot be too careful and guarded in language and conduct in the presence of the jury, to avoid prejudice to either party." *Id.* Indeed, "the weight and dignity of the court accompanies each question or comment." *Thompson v. State*, 468 So. 2d 852, 854 (Miss. 1985). Because of this, "[i]t is the duty of all trial judges to be comparable to Caesar's wife – above suspicion – and it is encumbent upon them to maintain a position of impeccable impartiality, and where the jury could have been misled . . . by the statements though inadvertently made by a trial judge, this Court" must remand the case for a new trial. *Travelers Indem. Co. v. Rawson*, 222 So. 2d 131, 136-37 (Miss. 1969). If jurors were exposed to improper influences that might have produced the verdict, "the presumption of law is against its purity." *Green*, 53 So. at 415.

¶48. A reading of the jury instructions and the special verdict form indicates that they were specific and clear. Questioning the jury was unnecessary, and it was certainly unnecessary and inappropriate to use the word "only" in the questionnaire to describe the amount the jury awarded Nix. Further, once the jury unequivocally answered the questionnaire, it was

28

likewise unnecessary to continue questioning them on it. Even if inadvertent, the judge's comments appear to indicate to the jury that their compensatory damages award was insufficient. Given the timing – that punitive damages were submitted to the jury immediately after this colloquy – we are unable to say with confidence that the judge's remarks did not affect the punitive damages award. For this reason, this Court reverses the punitive damages award and remands the case for a new trial on punitive damages only.

*4. Attorney's Fees*

¶49. Union Carbide argues that the award of attorney's fees and costs should be set aside because it is unsupported by a valid punitive damages award and because it is unsubstantiated by any findings of fact. An award of attorney's fees is justified when punitive damages are awarded. ***United Am. Ins. Co. v. Merrill***, 978 So. 2d 613, 636 (Miss. 2007). Because this Court reverses the punitive damages award and remands for a new trial on punitive damages, it also vacates the award of attorney's fees. If punitive damages are again awarded, then attorney's fees would be an appropriate consideration.

¶50. Alternatively, Union Carbide argues that the attorney's fees award was unsubstantiated by any findings of fact. While this Court declines to address this issue, we note that the issue may arise again on remand. The trial court made utterly no findings of fact as to how it determined the amount of attorney's fees. If the trial court considers attorney's fees on remand, it should make findings of fact on the issue.[15]

---

[15]Rule 1.5(a) of the Rules of Professional Conduct and ***McKee v. McKee***, 418 So. 2d 764, 767 (Miss. 1982), set forth a list of factors that a court must consider in determining the reasonableness of attorney's fees. Further, the court "shall make the award based on the information already before it and the court's own opinion based on experience and

29

¶51.    Union Carbide also argues that the court's award of $4,451.44 for Nix's pro rata share of the special master fees is an abuse of discretion, because an agreed order mandated that the special master fees be paid proportionally by the parties on a pro rata basis.  This Court has previously ruled that assessing the costs of a special master against the nonprevailing party is appropriate, even when a previous order required that the parties split the cost of the master.  *Crowe v. Smith*, 603 So. 2d 301, 308-09 (Miss. 1992).   The Court noted that Rule 54 of the Mississippi Rules of Civil Procedure authorizes awarding costs to the prevailing party, and that Rule 53 indicates that the compensation of a special master is a "cost" of court.  *Id.*; Miss. R. Civ. P. 54(d); Miss. R. Civ. P. 53(a).  In *Crowe*, the Court found that "it appears that the court made a preliminary determination for compensating the master.  Then, once a prevailing party had been determined, the chancellor assessed the non-prevailing party with those costs which the prevailing party had incurred for services of the special master." *Crowe*, 603 So. 2d at 308-09.   Further, it noted that "the official expenses which the prevailing party incurs and which the non-prevailing party must reimburse cannot be determined until judgment, when a prevailing party is determined." *Id.* at 308.  Thus, Union Carbide's argument that it should not have to pay the special master fee has no merit, and the trial court is affirmed on this issue.

### 5. Postjudgment Interest

¶52.    Nix requested that the court set postjudgment interest at the rate of four percent per

---

observation." Miss. Code Ann. § 9-1-41 (Rev. 2002).  Any award of attorney's fees "should be supported with factual determinations." *Miss. Power & Light Co. v. Cook*, 832 So. 2d 474, 487 (Miss. 2002).

30

annum to accrue from the day after the jury rendered its verdict (October 12, 2011). The trial court awarded postjudgment interest at a rate of eight percent per annum, to accrue from October 12, 2011. Union Carbide argues that this rate imposes a penal fine on Union Carbide, provides a windfall to the plaintiff, and is contrary to the established purpose of postjudgment interest under Mississippi law. Union Carbide argues that the court should have used the federal rate of postjudgment interest, which would be 0.11%. It also argues that the interest should not accrue until the time the judgment becomes appealable.

¶53. The law states that judgments "shall bear interest at a per annum rate set by the judge hearing the complaint from a date determined by such judge to be fair but in no event prior to the filing of the complaint." Miss. Code Ann. § 75-17-7 (Rev. 2009). The plain language of the statute gives the judge wide latitude to determine both the interest rate and the date from which it runs, provided that the date is not a date prior to the date the complaint was filed. This Court has upheld postjudgment interest rates of eight percent and greater. *U.S. Fidelity & Guar. Co. v. Estate of Francis*, 825 So. 2d 38, 50 (Miss. 2002) (rate of one percent above the prime rate of eight percent was within chancellor's discretion); *see also Miss. Baptist Health Sys., Inc. v. Kelly*, 88 So. 3d 769, 782 (Miss. Ct. App. 2011) (upholding eight percent postjudgment interest rate awarded from the date of the verdict). In fact, the interest rate apparently was previously set statutorily at eight percent for "all notes, accounts and contracts." *See Public Employees' Retirement Sys. v. Langham*, 812 So. 2d 969, 975 (Miss. 2002). Based on the broad statutory language and the fact that the judge's award fell within the strictures of the statute and finds support in past caselaw, the trial court did not abuse its discretion in awarding postjudgment interest at the rate of eight percent, to run from

31

the day after the jury verdict.

## CONCLUSION

¶54. This Court affirms the trial court's denial of the motion for JNOV in regard to the jury verdict awarding compensatory damages to Nix based on his inadequate warning claim. Given the conflicting evidence surrounding the inadequate warning claim, reasonable jurors could arrive at different conclusions. It was also appropriate to submit the issue of punitive damages to the jury, given the evidence of Union Carbide's knowledge of the dangers of asbestos and the inadequacy of its warning. However, because the trial court made improper comments that potentially influenced the jury in making its punitive damages award, this Court reverses the punitive damages award and remands for a new trial on punitive damages only. Moreover, because the attorney's fees no longer have any basis without a punitive damages award, this Court vacates the award of attorney's fees, allowing the issue to be considered if punitive damages are again awarded. However, the trial court did not err in awarding Nix his costs for the special master. Last, the trial court did not abuse its discretion in awarding postjudgment interest at the rate of eight percent to run from the day after the jury verdict, as the statute gives the judge wide discretion in making this determination, and his determination does not fall outside reasonable bounds as previously delineated by the Legislature and this Court.

¶55. Therefore, this Court affirms in part (the jury verdict awarding compensatory damages, the special master fee, and the award of postjudgment interest), reverses in part (the punitive damages award), vacates in part (the award of attorney's fees), and remands for a new trial on the issue of punitive damages.

32

¶56.   **AFFIRMED IN PART; REVERSED IN PART; VACATED IN PART AND REMANDED.**

**LAMAR, KITCHENS, AND CHANDLER, JJ., CONCUR. DICKINSON, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, J. COLEMAN, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J. WALLER, C.J., RANDOLPH, P.J., AND PIERCE, J., NOT PARTICIPATING.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶57.   Russell Nix settled with Union Carbide Corporation and signed a release. I agree that the release clearly allowed him to pursue his claim for "mesothelioma . . . or death resulting from . . . mesothelioma . . . ." But the release just as clearly released Union Carbide Corporation from

> ***any and all claims, causes or rights of action, demands of every kind and nature whatsoever***, including, without limitation, all future and present claims that RUSSELL E. NIX . . . may now or hereafter have including any and all asbestos-related diseases, injuries, cancers, and/or malignancies, now or arising hereafter . . . .

¶58.   In my view, releasing "any and all claims, causes or rights of action, demands of every kind and nature whatsoever" unambiguously releases claims for punitive damages and attorney fees. I would reverse the punitive-damages and attorney-fees awards and affirm the compensatory-damages award.

**COLEMAN, J., JOINS THIS OPINION**.

**COLEMAN, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶59.   The majority is absolutely correct when writing, "Absent a valid claim for compensatory damages, there can be no claim for punitive damages." However, it does not

33

follow that, because compensatory damages are a prerequisite for punitive damages, punitive damages are awarded for a successful claim of a specific injury. In fact, semantically speaking, the fact that two separate terms – compensatory and punitive – exist would indicate that the former is to compensate for an injury and the latter is for, well, something else.

¶60. I agree with the result reached by Presiding Justice Dickinson, because the release allowed Nix to pursue claims only for injury resulting from mesothelioma. Punitive damages do not compensate for an injury; they punish conduct. *T.C.B. Constr. Co., Inc. v. W.C. Fore Trucking, Inc.*, 134 So. 3d 701, 704 (¶ 9) (Miss. 2013). Moreover, Mississippi law disfavors them. *Warren v. Derivaux*, 996 So. 2d 729, 738 (¶ 27) (Miss. 2008). In order to reach a correct result on the issue, I believe we must go further than a simple declaration that you cannot have one without the other and examine the actual nature of each type of award in the light of the contractual terms of the release. As the release explicitly applies to all claims arising from Union Carbide's conduct, other than a narrow exception for the injury of contracting mesothelioma, the awards of punitive damages and attorneys' fees should be reversed and rendered.

**DICKINSON, P.J., JOINS THIS OPINION.**